IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| APACHE CORPORATION, | § | |
| | § | |
| Plaintiff | § | |
| v. | § | Civil Action 4:10-cv-00076 |
| | § | |
| JOHN CHEVEDDEN | § | |
| | § | |
| Defendant. | § | |

## Apache's Brief on the Merits

Table of Contents

I.    Facts ...........................................................................................................1

      A.    Sequence of Events ...........................................................................1

      B.    Chevedden's Singular Sophistication ...............................................5

      C.    Chevedden's Prior (Withdrawn) Proposal to Apache...........................7

II.   The SEC Staff's No-Action Letters ..........................................................8

III.  Apache is Entitled to Exclude Chevedden's Proposal under Rule 14a-8(b) ...................10

      A.    Rule 14a-8(b) Unambiguously Requires Proof of
            Shareholder Status and Eligibility from the
            "Record" Holder of the Securities ...............................................10

      B.    Chevedden Failed to Provide the Required Proof.................................12

      C.    The *Hain Celestial* Anomaly ...........................................................13

            1.    *Hain Celestial* Conflicts with Rule 14a-8(b)(2).....................14

            2.    *Hain Celestial* Conflicts with the SEC Staff's Prior No
                  Action Letters...........................................................................15

            3.    The Staff's Solitary View in *Hain Celestial* Is Not
                  Entitled to Deference .............................................................17

IV.   Apache's Deficiency Notice Was Timely and Proper ....................................20

      A.    Apache Timely Issued its Deficiency Notice.....................................21

      B.    Companies with Tardy Deficiency Notices Still
            May Exclude Deficient Proposals......................................................23

V.    Conclusion .............................................................................................25

## Table of Authorities

Cases

*AFSCME v. AIG,*
    462 F.3d 121 (2d Cir. 2006)........................................................................17

*Amalgamated Clothing & Textile Workers Union v. SEC,*
    15 F.3d 254 (2d Cir. 1994)..........................................................................9

*Apache v. NYCERS,*
    621 F.Supp. 2d 444 (S.D. Tex. 2008) ................................................. passim

*Auer v. Robbins,*
    519 U.S. 452 (1997)....................................................................................17

*Hall v. Tyco International,*
    223 F.R.D. 219 (M.D. NC 2004) ..............................................................12

*NYCERS v. Brunswick Corp.,*
    789 F.Supp. 144 (S.D.N.Y. 1992) ..............................................................9

Statutes, Rules or Regulations

Rule 14a-8, 17 C.F.R. 240.14a-8 ...................................................... passim

No-Action Letters

Allegheny Energy, Inc. (Mar. 26, 2002)
AMR Corp. (Mar. 15, 2004)
Apache Corp. (Jan. 8, 2010)
Apache Corp. (Jan. 12, 2007)
AT&T Inc. (Jan. 17, 2008)
Battle Mountain Gold Company (Mar. 24, 2000)
Boeing Co. (Feb. 18, 2009)
Cigna Corp. (Feb. 21, 2006)
Clear Channel Communications (Feb. 9, 2006)
Coca-Cola Co. (Jan. 19, 2001)
Dell Computer (Apr. 5, 2002)
EMC Corp. (Mar. 14, 2002)
EQT Corp. (Jan. 11, 2010)
Exelon Corp. (Feb. 23, 2009)
General Motors Corp. (Apr. 3, 2002)
Hain Celestial Group (Oct. 1, 2008)
Int'l Bus. Machines Corp. (Jan. 9, 2006)
Int'l Bus. Machines Corp. (Jan. 7, 2002)

Johnson & Johnson (Jan. 5, 2009)
JP Morgan Chase & Co. (Feb. 15, 2008)
McCormick & Co., Inc. (Dec. 28, 2005)
McGraw Hill Cos., Inc. (Mar. 12, 2007)
McGraw Hill Cos., Inc. (Jan. 28, 2008)
McGraw-Hill Cos., Inc. (Feb. 23, 2009)
MeadWestvaco Corp. (Mar. 12, 2007)
Media General, Inc. (Jan. 26, 2005)
Microchip Tech. Inc. (May 26, 2009)
Mylan, Inc. (Jan. 4, 2010)
News Corp. (June 4, 2009)
Omnicom Group, Inc. (Mar. 16, 2009)
Oregon Trail Fin. Corp. (June 26, 2000)
Qwest Communications Int'l Inc. (Jan. 23, 2008)
Rentech, Inc. (Dec. 15, 2008)
Robert Half Int'l (Feb. 15, 2002)
Schering-Plough Corp. (Mar. 27, 2009)
Sempra Energy (Feb. 7, 2002)
Univision (Dec. 29, 2005)
Verizon Communications, Inc. (Jan. 9, 2006)
Verizon Communications, Inc. (Jan. 25, 2008)
Washington Mutual (Jan. 12, 2007)
Wells Fargo & Co. (Jan. 18, 2005)
Western Union Co. (Mar. 4, 2008)
Yahoo! Inc. (Feb. 1, 2005)

This Court should declare that Apache properly may exclude defendant John Chevedden's purported shareholder proposal from Apache's proxy materials in accordance with Rule 14a-8(b) and (f), promulgated under the Securities Exchange Act of 1934. Part I of this brief sets forth the undisputed facts and discusses Chevedden's familiarity with the shareholder proposal process. Part II discusses the weight courts generally assign to SEC staff no-action letters. Part III discusses the legal and factual basis for Apache's entitlement to exclude Chevedden's proposal. Part IV discusses Chevedden's legally and factually flawed notion that Apache should have issued its deficiency notice earlier than it did.

## I.
### Facts

The relevant facts are few, are evidenced by the attached written documents, and are not in dispute.

A.    Sequence of Events

On November 8, 2009, Chevedden sent Apache an email to which he attached a letter and what he referred to as a "Rule 14a-8 Proposal." (X-1). The substance of the proposal is not at issue. Chevedden did not coy the SEC or the SEC staff on his email to Apache.

Chevedden is not a registered or record holder of Apache securities. (Peper Aff. at ¶ 5).

On November 27, 2009, Chevedden sent Apache another email in which he wrote "Please see the attached broker letter. Please advise on Monday whether there are now any rule 14a-8 open items." (X-2). This time, Chevedden copied the SEC's Office of Chief Counsel, Division of Corporation Finance. *Id.* Chevedden admits that he sent his November 27 email attaching a broker letter "unprompted" by Apache and in order to complete the submission of his proposal to Apache. (Hrg. Tr. at 24:3-11) (all emphasis in this brief is added). The broker letter that Chevedden attached was a November 23 letter from Ram Trust Services to Chevedden, was

written in response to Chevedden's "request to confirm his position in several securities held in his account at Ram Trust Services," and asks "To Whom it May Concern" to "accept this letter as confirmation that John R. Chevedden has continuously held no less than 50 shares of the following security since November 7, 2008: Apache Corp (APA)." (X-2).

Neither Chevedden nor RAM Trust Services is a registered or record holder of Apache securities. (Peper Aff. at ¶ 5).[1]

On December 3, 2009, Apache responded to Chevedden that:

we have been unable to confirm your current ownership of Apache stock, or the length of time that you have held the shares.

Although you have provided us with a letter from RAM Trust Services, the letter does not identify the record holder of the shares or include the necessary verification. Apache has reviewed the list of record owners of the company's common stock, and neither you, nor RAM Trust Services are listed as an owner of Apache's common stock. Pursuant to Rule 14a-8(b), since neither you nor RAM Trust Services is a record holder of Apache common stock, you must provide a written statement from the record holder of the shares you beneficially own verifying that you continually have held the required amount of Apache common stock for at least one year as of the date of your submission of the proposal. As required by Rule 14a-8(f), you must provide us with this statement within 14 days of your receipt of this letter. We have attached to this notice of defect a copy of Rule 14a-8 for your convenience.

(X-3).

On December 3, 2009, Chevedden responded by email to Apache's December 3 letter and wrote that "the attached page from rule 14a-8 is believed to state that a company must notify the proponent of any defect within 14-days of the receipt of a rule 14a-8 proposal – which was already acknowledged by the company to be almost a month ago." (X-4). Chevedden again sent a copy to the SEC staff. *Id.*

---

[1] RAM Trust Services is an investment advisory firm that, according to its website, "provides superior, highly personalized and fully integrated financial services primarily to **high net worth** families, individuals and private foundations." (X-15).

On December 8, 2009, Apache responded to Chevedden's December 3 email, and explained that:

> We did receive your initial shareholder proposal on November 9, 2009. However, we did not receive your submission of proof of ownership until November 27, 2009. In relevant part, Rule 14a-8(b)(2) states (emphasis added):
>
> > 2. If you are the registered holder of your securities, which means that your name appears in the company's records as a shareholder, the company can verify your eligibility on its own, although you will still have to provide the company with a written statement that you intend to continue to hold the securities through the date of the meeting of shareholders. **However, if like many shareholders you are not a registered holder, the company likely does not know that you are a shareholder, or how many shares you own. In this case, <u>at the time you submit your proposal</u>, you must prove your eligibility to the company in one of two ways:**
> >
> > i.   The first way is to submit to the company a written statement from the "record" holder of your securities (usually a broker or bank) verifying that, at the time you submitted your proposal, you continuously held the securities for at least one year. You must also include your own written statement that you intend to continue to hold the securities through the date of the meeting of shareholders; or. . .
>
> The Company did not receive your completed submission until November 27, 2009, the date you provided us with the letter from RAM Trust Services, which was intended to demonstrate that you satisfy the minimum ownership requirements of Rule 14a-8. It was then that the Company notified you of the defect in your submission by letter dated December 3, 2009, which was sent to you within 14 days of our receipt of your completed submission. As we stated in the defect letter, neither you, nor RAM Trust Services, are listed as a record holder of Apache stock. Therefore, you have 14 calendar days from the date of that letter to provide us with a written statement from the record holder of the shares you beneficially own verifying that you continually have held the required amount of Apache common stock for at least one year as of the date of your submission of the proposal. Failure to meet this deadline may result in your proposal being excluded from Apache's 2010 proxy statement.

(X-5) (bold and underlining in original).

On December 10, 2009, Chevedden responded and asked that Apache "see the attached broker letter. Please advise tomorrow whether there are now any rule 14a-8 open items." (X-6). The broker letter that Chevedden attached was a December 10 letter, again from Ram Trust Services "To Whom it May Concern" and, this time, stating that "As introducing broker for the account of John Chevedden, held with Northern Trust as custodian, Ram Trust Services confirms that John Chevedden has continuously held no less than 50 shares for the following security since November 7, 2008: Apache Corp (APA)." *Id.*

Neither Chevedden, nor RAM Trust Services, nor Northern Trust is a registered or record holder of Apache securities. (Peper Aff. at ¶ 5).

On January 8, 2010, Apache notified the SEC staff that "Apache intends to omit from the proxy statement for its 2010 Annual Meeting of Stockholders (the "2010 Proxy Materials") a stockholder proposal (the "Proposal") received from John Chevedden (the "Proponent")." (X-7). Apache informed the SEC staff that it "intends to exclude its proposal unless a U.S. District Court rules that the Company is obligated to include it in its 2010 Proxy Materials." *Id.* That day, January 8, Apache filed its Complaint in this action. (Docket #1). Apache has provided the SEC staff with a copy of the Complaint.

On January 11, 2010 – after Apache filed suit – Chevedden sent the SEC staff a copy of RAM Trust Service's December 10, 2009 letter and opined that this "broker letter appears to be consistent with the attached precedent of *The Hain Celestial Group, Inc.* (Oct. 1, 2008)." (X-8).

On January 22, 2010 – long past Rule 14a-8(f)'s 14-day deadline in which shareholders "must" correct deficiencies in their proof of shareholder status and eligibility to submit proposals – RAM Trust Services sent Apache a letter and enclosed a letter addressed to Apache from Northern Trust. (X-9). In its letter about Chevedden, RAM Trust Services advised that it "acts

as his custodian for these shares.  Northern Trust, a direct participant in the Depository Trust Company, in turn acts as a master custodian for RTS.  Northern Trust is a member of the Depository Trust Company whose nominee name is Cede & Co."  In its January 22 letter, Northern Trust wrote that "Northern Trust Company is the custodian for Ram Trust Services.  As of November 7, 2009, Ram Trust Services held 183 shares of Apache Corporation CUSIP#037411105."

Chevedden has not submitted any letter or other proof from the Depository Trust Company or Cede & Co., which apparently is the actual "record" holder of Chevedden's purported stock.

B.    Chevedden's Singular Sophistication

At the February 11, 2010 hearing, Chevedden told this Court that he was just a "small investor," "a small person and, you know, against a big corporation."  (Hrg. Tr. at 46:5-47:9). That predictable suggestion is more than a touch misleading here.  When it comes to shareholder proposals, Apache is the "David" and Chevedden is the "Goliath."

Chevedden hopes to portray himself as less than sophisticated, and told the Court that "I'm no expert on all of the different precedents and the legal research that's required down here and this is a highly technical, highly technical area. . . ."  *Id.*  Chevedden neglects to mention that Chevedden's own conduct has given rise to much of the "informal" "precedent" found in the SEC staff's no-action letters.

- Chevedden appears to be the single most persistent proponent or proxy of purported shareholder proposals in history.   Since December 9, 1994, when Chevedden submitted his very first proposal – the SEC staff upheld its exclusion – proposals for which Chevedden has been proponent or proxy have been the subject of a whopping *953 SEC staff no-action letters*. (Langham Aff. at ¶ 5).[2]  That's more than 4.5 times

---

[2] Among the many companies Chevedden has targeted with his proposals are at least 20 companies incorporated or headquarted in Texas, including:  AMR Corp. - Fort Worth, Apache Corp. - Houston,

the 207 mentions for the next most frequently mentioned shareholder proponent, the AFL-CIO Reserve Funds. *Id.*

- In the past ten years, Chevedden's proposals have accounted for over *11.2%* (879 out of 7,837) of all proposals considered by the SEC staff in no-action letters. *Id.* Even that stunning ten year percentage is *low* compared to recent years. Chevedden's proposals have accounted for over *23.8%* (45 out of 189) of all SEC staff no-action letters so far in 2010, over *17.8%* (148 out of 831) of all no-action letters in 2009, and over 13.8% (102 out of 737) of all no-action letters in 2008. *Id.*

- In its no-action request letter in *McGraw-Hill Cos., Inc.* (Feb. 23, 2009), the company informed the SEC staff that "According to Risk Metrics Group ("RMG") the proxy advisory service, ***Mr. Chevedden submitted more than 125 shareholder proposals to more than 85 companies in 2008 alone***. Further, Mr. Chevedden and an alliance of nominal shareholders, including the Rossi family, the Steiner family and the Gilbert family, for whom he frequently serves as "proxy" *(the "Chevedden Group"), submitted more than 15% of all shareholder proposals submitted between 1997 and 2006.*"

- Through Chevedden's unrelenting sponsorship of often deficient purported shareholder proposals, this one "small person" and "small investor" very well may be responsible for imposing a greater burden on the limited time, resources, and funds of the SEC staff in this area than any other person or entity in history.

In stark contrast to Chevedden's staggering wealth of experience, Apache has received only 13 shareholder proposals in the last 50 years of its existence. (Peper Aff. at ¶ 6). Of these 13 proposals, seven were included in Apache's proxy materials, three were the subject of SEC staff no-action requests, two promptly were withdrawn, and one is at issue in this lawsuit. Of the three proposals that were the subject of SEC staff no-action requests, one was rendered moot when the proposal was withdrawn (by Chevedden), one was excluded with the concurrence of the SEC staff, and one was excluded with the concurrence of the SEC staff and based on the court's ruling in *Apache v. NYCERS,* 621 F.Supp.2d 444 (S.D. Tex. 2008) (Miller, J.). *Id.*

---

AT&T, Inc. - Dallas, Baker Hughes Corp. - Houston, Burlington Northern Sante Fe Corp. - Fort Worth, Continental Airlines - Houston, Electronic Data Systems - Plano, El Paso Corp. - Houston, Ensco International - Dallas, Exxon Mobil - Irving, Greyhound Lines, Inc. - Dallas, Halliburton - Houston, Marathon Oil - Houston, Radio Shack Corp. - Fort Worth, Sabre Holdings - Southlake, SBC Communications - Dallas, Service Corporation International - Houston, Southwest Airlines - Dallas, Texas Instruments Inc. - Dallas, and Whole Foods Market - Austin.   (Langham Aff. at ¶ 4).

Companies across America have been compelled to devote enormous time, resources and money to dealing with Chevedden's purported shareholder proposals. In *Boeing Co.* (Feb. 18, 2009), the company addressed this point in its no-action request to the SEC staff:

> As the Staff is no doubt aware, management of and responses to these proposals represent an enormous investment of time and resources by each of the target companies. Each target company must, among other things, determine whether the shareholder for whom John Chevedden is acting as "proxy" is eligible to submit a proposal, ***correspond with Mr. Chevedden regarding the inevitable procedural and substantive defects in his proposals***, evaluate, usually with the assistance of legal counsel, whether the company will oppose the proposals, draft and file no-action letters, draft and file rebuttal letters in response to Mr. Chevedden's responses to no-action letter requests and draft opposition statements in the event that his proposals are not excludable. All told, the foregoing activities represent an ***enormous expenditure of time, personnel and money*** that we believe is excessive in light of the intent and purpose of the shareholder proposal regulations.

C.   Chevedden's Prior (Withdrawn) Proposal to Apache

Chevedden submitted one other purported shareholder proposal to Apache before submitting the proposal at issue here. Apache's experience with Chevedden regarding that prior proposal – and Chevedden's history of withdrawing other proposals when faced with questions about shareholder status – raises considerable doubt about Chevedden's inadequately substantiated purported shareholder status here.

On November 28, 2006, a purported shareholder named Lucy M. Kessler sent Apache a proposal with a "proxy for John Chevedden and/or his designee to act on my behalf." *Apache Corp.* (Jan. 12, 2007) (X-10). Apache responded by noting that Kessler "is not a record owner" and requested that she or Chevedden verify her shareholder status and eligibility under Rule 14a-8(b). *Id.* Neither Chevedden nor Kessler responded and, on December 18, 2006, Apache sent a request for no-action letter to the SEC staff. *Id.* In response, and rather than provide the required proof of shareholder status and eligibility, Chevedden withdrew the proposal. *Id.*

Chevedden has *withdrawn* a multitude of other proposals to other companies when he or the purported shareholder naming him as proxy has been faced with a company's request for proof of shareholder status and eligibility under Rule 14a-8(b). *See, e.g., Mylan, Inc.* (Jan. 4, 2010); *News Corp.* (June 4, 2009); *Johnson & Johnson* (Jan. 5, 2009); *Washington Mutual* (Jan. 12, 2007); *Verizon Communications* (Jan. 9, 2006); *IBM* (Jan. 9, 2006); *Univision* (Dec. 29, 2005).    There is no record of Chevedden ever explaining his conduct, and no record of Chevedden ever apologizing to any company (or to the SEC staff) for causing them to devote time, attention and substantial amounts of money to dealing with his often improper submission of proposals.

II.
The SEC Staff's No-Action Letters

In *Apache v. NYCERS,* 621 F.Supp.2d 444, 448 n.3 (S.D. Tex. 2008), Judge Miller noted that "The no-action letter, however, is an informal response, and does not amount to an official statement of the SEC's views." The SEC staff agrees.   The SEC staff typically includes with its no-action letters a one page statement titled "Division of Corporate Finance – Informal Procedures Regarding Shareholder Proposals" in which the staff explains the "nonbinding" and "informal" nature of its work.   The statement provides in part:

> The Division of Corporate Finance believes that its responsibility with respect to matters arising under Rule 14a-8 [17 CFR 240.14a-8], as with other matters under the proxy rules, is to aid those who must comply with the rule by offering *informal advice and suggestions* and to determine, initially, whether or not it may be appropriate in a particular matter to recommend enforcement action to the Commission. . . .
>
> *It is important to note that the staff's and Commission's no-action responses to Rule 14a-8(j) submissions reflect only informal views.*   The determinations reached in these no-action letters *do not and cannot adjudicate the merits* of a company's position with respect to the proposal.   *Only a court such as a U.S. District Court can decide whether a company is obligated to include shareholder proposals in its proxy materials.*   Accordingly a discretionary determination not to recommend or take Commission enforcement action, does not preclude a

proponent, or any shareholder of a company, from pursuing any rights he or she may have against the company in court, should the management omit the proposal from the company's proxy material.

(X-11).

Consistent with the SEC staff's own modest description of its work, Judge Miller likewise explained that:

> The proper weight to accord an SEC no-action letter is an issue of first impression in the Fifth Circuit. The Second Circuit, however, noted that no-action letters are interpretive because they do not impose or fix a legal relationship upon any of the parties. That court concluded that *no-action letters are nonbinding, persuasive authority. This court agrees. Therefore, a court must independently analyze the merits of a dispute* even when affirming the SEC's conclusion.

*Apache,* 621 F.Supp.2d at 448 *(citing Amalgamated Clothing & Textile Workers Union v. SEC,* 15 F.3d 254, 257 (2d Cir. 1994); *NYCERS v. Brunswick Corp.,* 789 F.Supp. 144, 146 (S.D.N.Y. 1992)).

In this case, unlike in *Apache v. NYCERS,* the SEC staff has not issued a no-action letter indicating, even informally, whether it agrees that Apache may exclude Chevedden's proposal for failure to comply with Rule 14a-8(b). Nor is the SEC staff likely to issue a no-action letter or otherwise comment on the matters at issue in this case. On July 14, 2001, the SEC staff issued "Division of Corporation Finance: Staff Legal Bulletin No. 14" for the purpose of explaining the Rule 14a-8 no-action process, providing "guidance to companies and shareholders by expressing our views on some issues and questions that commonly arise under rule 14a-8," and suggesting ways to facilitate no-action reviews. Section B.9. of the Bulletin provides:

> Will we comment on the subject matter of pending litigation?

> No. Where the arguments raised in the company's no-action request are before a court of law, our policy is not to comment on those arguments. Accordingly, our no-action response will express no view with respect to the company's intention to exclude the proposal from its proxy materials.

(X-12).  This Court is free to, and should, "independently analyze the merits" of this dispute. *See Apache,* 621 F.Supp. 2d at 448.

III.

Apache is Entitled to Exclude Chevedden's Proposal under Rule 14a-8(b)

Rule 14a-8, 17 C.F.R. § 240.14a-8, sets forth the rules and regulations that govern "when a company must include a shareholder's proposal in its proxy statement and identify in its form of proxy when the company holds an annual or special meeting of shareholders."  The introduction to Rule 14a-8 advises shareholders that "In summary, in order to have your shareholder proposal included on a company's proxy card, and included along with any supporting statement in its proxy statement, *you must be eligible and follow certain procedures.*"

A.    Rule 14a-8(b) Unambiguously Requires Proof of Shareholder Status and Eligibility from the "Record" Holder of the Securities

The most fundamental eligibility requirement for submitting shareholder proposals is that proponents of proposals actually be able to prove that they in fact are shareholders.  Rule 14a-8(b) unequivocally and with specificity places this burden of proof on the purported shareholders, and provides in relevant part:

> Question 2: Who is eligible to submit a proposal, and *how do I demonstrate to the company that I am eligible?*
>
> 1.    In order to be eligible to submit a proposal, you must have continuously held at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date you submit the proposal. You must continue to hold those securities through the date of the meeting.
>
> 2.    If you are the registered holder of your securities, which means that your name appears in the company's records as a shareholder, the company can verify your eligibility on its own, although you will still have to provide the company with a written statement that you intend to continue to hold the securities through the date of the meeting of shareholders. However, *if like many shareholders you are not a registered holder,* the company

likely does not know that you are a shareholder, or how many shares you own.  In this case, ***at the time you submit your proposal, you must prove your eligibility to the company in one of two ways:***

i.    The first way is to submit to the company a *written statement from the "record" holder of your securities* (usually a broker or bank) verifying that, at the time you submitted your proposal, you continuously held the securities for at least one year.  You must also include your own written statement that you intend to continue to hold the securities through the date of the meeting of shareholders; . . . .

The "second way" involves publicly filed records of ownership like Schedule 13Ds, and does not apply to Chevedden in this case.  *See* Rule 14a-8(b)(2)(ii).

Rule 14a-8(b)(2) is unambiguous.  The Rule squarely places the burden of proof on the purported shareholder, here Chevedden, and, in particular, any such shareholder:

- "***must prove*** your eligibility to the company"

- "***at the time*** you submit your proposal"

- by "submit[ting] to the company a written statement ***from the 'record' holder*** of your securities."

Rule 14a-8(b)(2)'s requirement that, in order to prove his shareholder status and eligibility, Chevedden "must" submit "a written statement from the 'record' holder of [his] securities" is clear and unambiguous.  It also is a serious and considered requirement.  In § C.1.c.(1) of its July 14, 2001 Staff Legal Bulletin No. 14, the SEC staff reinforced and codified the "record" holder requirement and explained:

Does a written statement from the shareholder's investment adviser verifying that the shareholder held the securities continuously for at least one year before submitting the proposal demonstrate sufficiently continuous ownership of the securities?

The written statement ***must be from the record holder*** of the shareholder's securities, which is usually a broker or bank. Therefore, *unless the investment adviser is also the record holder, the statement would be **insufficient under the rule**.*

(X-12). Similarly, in § C.2. of its September 15, 2004 Staff Legal Bulletin No. 14B, the SEC staff again confirmed Rule 14a-8(b)(2)'s clear requirement that "*the shareholder proponent 'must' prove its eligibility by submitting . . . a written statement from the 'record' holder of the securities*". (X-13).

In *Hall v. Tyco Int'l,* 223 F.R.D. 219, 246 (M.D. NC 2004), the court upheld the exclusion of a shareholder proposal and held that "the *shareholder must meet certain deadlines* for submitted proposals. . . . *If the shareholder fails to meet the eligibility requirements* for filing a shareholder proposal (after proper notice from the company to correct deficiencies), or if the proposal is properly excludable for the substantive reasons listed in Rule 14a-8(i), *the company may exclude the proposal from its proxy materials*."

Rule 14a-8(f) addresses this question: "What if I fail to follow one of the eligibility or procedural requirements explained in answers to Questions 1 through 4 of this section?  1.  *The company may exclude your proposal*, but only after it has notified you of the problem, and you have failed adequately to correct it."

B.    Chevedden Failed to Provide the Required Proof

Rule 14a-8(b)(2) provides that if a shareholder is not "the registered holder of your securities" – and Chevedden is not – then that *shareholder "must prove* [their] eligibility to the company in one of two ways." The way that potentially could apply to Chevedden is Rule 14a-8(b)(2)(i)'s requirement "to submit to the company a *written statement from the 'record' holder of your securities*." Chevedden failed to meet this mandatory requirement. Neither Chevedden, nor Ram Trust Services, nor Northern Trust is a record holder of Apache securities. (Peper Aff. at ¶ 5).

Chevedden did *not* submit any statement or other proof from DTC or its nominee Cede & Co., which the January 22, 2010 letters from Ram Trust Services and Northern Trust seem to

suggest is the record owner of the securities. (X-9).[3]  Furthermore, the January 22, 2010 letters, which suggest that Cede & Co. is the record holder of Chevedden's purported shares, were submitted well outside the 14-day period afforded to Chevedden to cure the defects in his proposal, as prescribed under Rule 14a-8(f).

C.    The *Hain Celestial* Anomaly

In *The Hain Celestial Group* (Oct. 1, 2008), the SEC staff deviated from its historical approach to proof of ownership when it expressed its informal view that "After further consideration and consultation, we are now of the view that a written statement from an introducing broker-dealer constitutes a written statement from the 'record' holder of securities, as that term is used in rule 14a-8(b)(2)(i).  For purposes of the preceding sentence, an introducing broker-dealer is a broker-dealer that is not itself a participant of a registered clearing agency but clears its customers' trades through and establishes accounts on behalf of its customers at a broker-dealer that is a participant of a registered clearing agency and that carries such accounts on a fully disclosed basis."

The SEC staff's "informal view" in *Hain Celestial* is wrong and should not be followed. *Hain Celestial* is inconsistent with the plain language of Rule 14a-8(b)(2).  It conflicts with the staff's prior interpretations.  It conflicts with the actual SEC's repeated express confirmations

---

[3] Many securities in the United States are held by the Depository Trust Company ("DTC"), in its nominee name "Cede & Co."  Cede & Co. holds shares on behalf of banks, brokers, and other financial institutions that, in turn, hold shares on behalf of their beneficial owner clients, such as individual investors.  The SEC's requirement that a shareholder obtain proof of ownership from the "record" holder appears to be based on the SEC's notion that companies, before being required to include purported shareholder proposals in their proxy materials, should be entitled to verify that shareholder proponents are in fact shareholders.  Rule 14a-8(b)(2) recognizes this when it says that "if like many shareholders you are not a registered holder, *the company likely does not know that you are a shareholder*, or how many shares you own."  In this circumstance, shareholders need to provide proof of stock ownership in the form of a statement from the "record" holder of the shares so that companies may compare the information provided with their stockholder lists to verify stock ownership.

that proof must come from the "record" holder.  It is inconsistent with at least one post-*Hain Celestial* SEC staff no-action letter in which the staff allowed the exclusion of a purported shareholder proposal despite the shareholder's submission from the "corporate co-trustee and custodian" and purported "record holder" of the shares.  *See Omnicom Group, Inc.* (Mar. 16, 2009).  *Hain Celestial* has not been followed by any subsequent SEC staff no-action letter.[4]

1.  *Hain Celestial* Conflicts with Rule 14a-8(b)(2)

Rule 14a-8(b) specifies the ways in which shareholders who are not themselves record holders must demonstrate proof of ownership.  If such shareholders do not file beneficial ownership reports with the SEC, then they "must" obtain an affirmative statement from the "record" holder.  The SEC staff's no-action letter in *Hain Celestial* directly contravenes Rule 14a-8(b)(2)'s plain language.  Rule 14a-8(b)(2) mandates written proof from the "record" holder, while the "informal view" expressed in *Hain Celestial* condoned purported proof of ownership from an entity that admittedly was *not* the record holder, but who claimed that is was aware of the identity of the true record holder.

The SEC staff's informal view in *Hain Celestial* fundamentally alters the plain, considered, unambiguous, and publicly vetted language adopted by the SEC itself – that is, the actual U.S. Securities and Exchange Commission – and does so without so much as public notice or comment period, and apparently without the approval (and perhaps without the knowledge) of the SEC itself.  When the SEC actually intends to amend its rules, it knows how to do so, and has done so through a series of SEC Releases, including the SEC's Release No. 34-40018 (May 21,

---

[4] *Hain Celestial* has been cited in only three no-action requests, all from AIG.  In all three instances, AIG cited *Hain Celestial* as part of its criticism of Chevedden having submitting identical proposals to multiple companies under the same nominal proponents' names.  *See AIG* (Mar. 16, 2009); *AIG* (Mar. 16, 2009); *AIG* (Mar. 13, 2009).

1998)[5] in which the SEC expressly adopted the "record" holder requirement that the SEC staff chose to diminish in *Hain Celestial*. *See, e.g.,* Release No. 34-39093 (Sept. 18, 1997); Release No. 34-25217 (Dec. 21, 1987); Release No. 34-20091 (Aug. 16, 1983); Release No. 34-19135 (Oct. 14, 1982).

If there is to be an amendment to Rule 14a-8(b)(2)'s unambiguous requirement that shareholders must satisfy their burden of proving their status and eligibility by submitting "to the company a written statement from the 'record' holder of your securities" – and it's not at all clear that there should be – that amendment should and must come from the SEC itself, not from the inconsistent and informal views of the staff.

   2.   *Hain Celestial* Conflicts with the SEC Staff's Prior No Action Letters

In *JP Morgan Chase & Co.* (Feb. 15, 2008) – issued just 7 ½ months before *Hain Celestial* and concerning near identical facts – the SEC staff considered whether the company could exclude a proposal where the proponent's proxy (Chevedden, the same proxy as in *Hain Celestial*) submitted a letter from the proponent's introducing broker (DJF Discount Brokers, the same "introducing broker" as in *Hain Celestial*) purporting to verify the proponent's stock ownership. The SEC staff concluded in *JP Morgan Chase* that *"While it appears that the proponent provided some indication that it owned shares, it appears that **it has not provided a statement from the record holder** . . . ."*

Because JP Morgan Chase had "failed to inform the proponent of what would constitute appropriate documentation," the staff allowed the proponent an additional seven days to try to

---

[5] On May 21, 1998, the SEC adopted amendments to its rules on shareholder proposals. *See* SEC Release 34-40018. Among other amendments, the SEC recast Rule 14a-8 into a Q&A format and, in doing so, confirmed that shareholders who "are not a registered holder" of stock "must prove your eligibility . . . [by] submit[ting] to the company a written statement from the 'record' holder of your securities . . .", as still reflected in Rule 14a-8(b)(2).

provide "appropriate documentary support of ownership" and, failing that, determined that "we will not recommend enforcement action to the Commission if JP Morgan Chase omits the proposal from its proxy materials in reliance on rules 14a-8(b) and 14a-8(f)." The SEC staff reached this same result in two other no-action letters that also involved Chevedden as proxy and DJF as introducing broker. *See Verizon Communications, Inc.* (Jan. 25, 2008); *MeadWestvaco Corporation* (Mar. 12, 2007). The SEC staff reached one result in *JP Morgan Chase, Verizon Communications,* and *MeadWestvaco,* and reached the opposite result in *Hain Celestial.* All four matters dealt with near identical facts, including proposals from Chevedden as proxy and letters from an "introducing broker" called DJF Discount Brokers.

While *Hain Celestial* stands alone and has yet to be relied on in any no-action letter, *JP Morgan Chase, Verizon Communications,* and *MeadWestvaco* are supported by a long line of SEC staff no-action letters in which the staff faithfully adhered to the plain language of Rule 14a-8(b)(2) and its unambiguous requirement that proof of shareholder status and eligibility "must" come from the "record" holder. A broad and comprehensive survey of the SEC staff's no-action letters since May 21, 1998 (when the continuous beneficial ownership eligibility requirement was last amended in SEC Release No. 34-40018) reveals near unanimous support for the proposition that ***proof of beneficial ownership must come directly from the "record" holder*** of the proponent's shares.[6] Both *before and after* the staff's issuance of the *Hain*

---

[6] *See, e.g., EQT Corp.* (Jan. 11, 2010); *Microchip Tech. Inc.* (May 26, 2009); *Schering-Plough Corporation* (Mar. 27, 2009); *Omnicom Group Inc.* (Mar. 16, 2009) SEC No-Act. LEXIS 506; *Omnicom Group Inc.* (Mar. 16, 2009) SEC No-Act. LEXIS 438; *Rentech, Inc.* (Dec. 15, 2008); *Western Union Co.* (Mar. 4, 2008); *JP Morgan Chase & Co.* (Feb. 15, 2008); *McGraw Hill Co., Inc.* (Jan. 28, 2008); *Verizon Communications Inc.* (Jan. 25, 2008); *Qwest Communications Int'l Inc.* (Jan. 23, 2008); *AT&T Inc.* (Jan. 17, 2008); *MeadWestvaco Corp.* (Mar. 12, 2007); *McGraw Hill Co., Inc.* (Mar. 12, 2007); *Cigna Corp.* (Feb. 21, 2006); *Clear Channel Commc'ns, Inc.* (Feb. 9, 2006); *McCormick & Co., Inc.* (Dec. 28, 2005); *Yahoo! Inc.* (Feb. 1, 2005); *Media General, Inc.* (Jan. 26, 2005); *Wells Fargo & Co.* (Jan. 18, 2005); *AMR Corp.* (Mar. 15, 2004); *General Motors Corp.* (Apr. 3, 2002); *Allegheny Energy, Inc.* (Mar. 26, 2002);

*Celestial* no-action letter, the staff granted no-action relief under Rule 14a-8(b) to companies that argued that proponents failed to provide sufficient proof of beneficial ownership by providing statements from investment advisers, financial advisers, custodians, trustees and other third-parties that were *not "record" holders* of the proponents' shares.

> 3.   The Staff's Solitary View in *Hain Celestial* Is Not Entitled to Deference

At best, the SEC staff's "no-action letters are nonbinding, persuasive authority." *Apache,* 621 F.Supp. 2d at 448.  Unlike the situation in *Apache v. NYCERS,* the SEC staff has not issued a no-action letter in this case.  Chevedden, however, seems to want to argue that the SEC staff's rogue views in *Hain Celestial* should be controlling here.  (Hrg. Tr. at 18-19).  It most certainly should not.

Courts do *not* grant deference to an agency's interpretation of an unambiguous regulation, and do *not* grant deference to an agency's interpretation when that interpretation conflicts with its prior interpretations.  *See, e.g., AFSCME v. AIG,* 462 F.3d 121, 126, 129 (2d Cir. 2006); *Auer v. Robbins,* 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulation is entitled to deference provided that the regulation is ambiguous).  Here, Rule 14a-8(b)(2) is unambiguous, *and* the SEC staff's interpretation in *Hain Celestial* is wildly inconsistent with the staff's prior (and subsequent) interpretations, *and* the SEC staff is *not* the agency – the SEC itself is, and the SEC's only statements and interpretations have been entirely consistent with Rule 14a-8(b)(2)'s unambiguous requirement that written proof of shareholder status and eligibility "must" come from the "'record' holder of your securities."

---

*EMC Corp.* (Mar. 14, 2002), SEC No-Act. LEXIS 382; *EMC Corp.* (Mar. 14, 2002), SEC No-Act. LEXIS 617; *Robert Half Int'l* (Feb. 15, 2002); *Sempra Energy* (Feb. 7, 2002); *Int'l Bus. Machines Corp.* (Jan. 7, 2002); *Coca-Cola Co.* (Jan. 19, 2001); *Oregon Trail Fin. Corp.* (June 26, 2000).

Simply put, the SEC staff's solitary view expressed in *Hain Celestial* is inconsistent with the staff's long and otherwise unblemished line of no-action letters. And the outlier view expressed in *Hain Celestial* is inconsistent with and, indeed, flatly contravenes the plain and unambiguous language of Rule 14a-8(b)(2) requiring that the proof of ownership come from the "record" holder of the securities.

This Court should apply Rule 14a-8(b)(2) as written. That, of course, would be consistent with the rule itself. It also would be in line with the apparent policy underlying the rule that companies should not have to look any further than their own records to substantiate a shareholder's purported proof of ownership. *See* Rule 14a-8(b) ("if like many shareholders you are not a registered holder, the company likely does not know you are a shareholder"). To hold otherwise improperly would shift the express proof of ownership burden that Rule 14a-8(b) imposes on shareholders onto companies. For example, a company that receives a purported proof of ownership from a purported "introducing broker" would have to take steps to determine whether such broker in fact has a "relationship with the clearing and carrying broker-dealer through which it effects transactions and establishes accounts for its customers" that enables such brokers "to verify its customer's beneficial ownership," as was assumed in *Hain Celestial.*[7]

---

[7] The letter from DJF Discount Brokers in *Hain Celestial* expressly stated that DJF was the "introducing broker" for the proponent. In contrast, the November 23, 2009 letter from Ram Trust Services here, which Chevedden sent to Apache on November 27, does *not* state that Ram Trust Services is the introducing broker for Chevedden. (X-2). The December 10 letter from Ram Trust Services does state that it is the introducing broker, (X-6), but there is ample reason to doubt that unverified assertion.

Ram Trust Services' form of "Investment Management Agreement" with its clients ***does not say that Ram Trust Services is an introducing broker*** and, instead, provides in ¶ 6 that "Unless otherwise instructed by the Client, RAM will execute all requested purchases and sales of securities through Atlantic Financial Services of Maine, Inc. ("AFS"), or another registered broker-dealer of RAM's selection. The Client acknowledges that ***AFS is an introducing broker*** that is an affiliate of both RAM TRUST COMPANY and Ram Trust Services, Inc." (X-14).

Further, Ram Trust Services' website does *not* say that it is an introducing broker. To the contrary, Ram Trust Services' website indicates that Ram Trust Services is a "financial management" firm that "actively manage[s] our clients' portfolios and, when appropriate, serve[s] as advocates for our

It is not at all clear how companies easily can determine that this is the case, and such a shift in the burden and manner of "proof" certainly would require companies to devote even more time, resources and money than they already do to this process.

The SEC knows this and, through Rule 14a-8(b)(2), chose to require shareholders who wish to make proposals to either register shares in their own names (in which case "the company can verify your eligibility on its own"), or to affirmatively obtain proof of ownership and eligibility from the "record" holder. If it thought it appropriate to do so, the SEC certainly could have written or amended Rule 14a-8(b)(2) to allow proof from a purported shareholder's broker or investment advisor or from some other financial institution.[8] But the SEC has not done that and, instead, expressly requires proof from the actual "record" holder of the securities.

With the one exception of *Hain Celestial*, the SEC staff faithfully and strictly has construed Rule 14a-8(b)(2)'s unambiguous requirement that shareholders who are not registered holders of stock obtain proof of ownership from the "record" holder of the stock. In applying this rule, the SEC staff repeatedly has determined that purported proof of ownership from any

---

clients' interest." *See* www.ramtrust.com/philosophy.htm. On the "Strategy" page of its website, Ram Trust Services refers to itself "As *investment advisors.*" (X-15); *see also* www.ramtrust.com/strategy.htm. In § C.1.c.(1) of Staff Legal Bulletin No. 14, the SEC staff made it perfectly clear that "*a written statement from the shareholder's investment adviser . . . would be insufficient under the rule*" "unless the investment adviser is also the record holder."

[8] The SEC staff consistently has found that proof of ownership from investment advisers is insufficient. In *Clear Channel Communications* (Feb. 9, 2006), the proponent submitted a letter from a broker-dealer and investment adviser who was not a record holder of Clear Channel's securities. Clear Channel argued in its no-action request that an investment adviser cannot verify ownership under Rule 14a-8(b) unless it is also a record holder of the company's securities. The SEC staff agreed and wrote in its response that while the proponent had "provided some indication that it owned shares," it had not "provided a statement from the record holder." *See also The McGraw Hill Companies, Inc.* (Jan. 28, 2008) (letter from the shareholder's financial advisor insufficient to demonstrate proof of ownership where the financial advisor was not listed in McGraw Hills' records as a shareholder); *Rentech, Inc.* (Dec. 15, 2008) (letter from NTB stating that the proponent was a customer of NTB and had held the requisite amount of shares for almost 10 years through NTB was insufficient where NTB was only an investment adviser of the proponent and not the record holder); Staff Legal Bulletin No. 14 (July 14, 2001).

entity that is not the record holder cannot satisfy the rule.  Even *after Hain Celestial,* the SEC staff found that proof of ownership from custodians who are not themselves "record" holders is insufficient under Rule 14a-8(b)(2).  In *Omnicom Group Inc.* (Mar. 16, 2009), the SEC staff granted no-action relief to Omnicom to exclude a shareholder proposal for failure to provide valid proof of ownership.  The proponent had attempted to demonstrate that it satisfied the rule's minimum ownership requirements with a letter from Amalgatrust, the co-trustee of the shareholder's pension fund and custodian of its shares.  But neither Amalgatrust nor its parent company was a "record" holder of Omnicom securities, so the purported proof was not sufficient.

Given Chevedden's singular commitment to the submission of shareholder proposals, he can avoid any actual or perceived burden of proof under Rule 14a-8(b) by registering the shares he truly owns in his own name, rather than having them held in street name as he apparently now does.  Alternatively, Chevedden and other shareholders may, as many shareholders do, prepare a letter to be signed by the DTC or its nominee Cede & Co. (if that is the actual "record" holder of the securities at issue) that can be used to establish ownership.  Either of these alternatives requires little effort and is more than justified by the cost that companies incur in evaluating, processing, and if appropriate, including shareholder proposals in their proxy materials.

## IV.
### Apache's Deficiency Notice Was Timely and Proper

In his December 3, 2009 letter, and at the hearing before this Court, Chevedden suggested that Apache should have issued its deficiency notice earlier than it did.  (Hrg. Tr. at 21:17-24:17).  Chevedden seems to suggest, though he doesn't actually say it, that Apache somehow may have waived its right to contest Chevedden's proposal.  Chevedden is wrong on the facts, wrong on the law, and wrong about the result.

A.   Apache Timely Issued its Deficiency Notice

On November 8, 2009, Chevedden sent Apache an email to which he attached a letter and what he called a Rule 14a-8 Proposal. (X-1). On November 27 and "unprompted" by Apache, Chevedden sent Apache another email, with a copy to the SEC staff, attached a "broker letter," and asked that Apache "Please advise on Monday whether there are now any rule 14a-8 open items." (X-2; Hrg. Tr. at 24:3-11). Although 19 days had passed between Chevedden's November 8 and November 27 submissions, Chevedden did *not* then claim that the operative date of his proposal should be November 8, and did *not* claim that Apache should be deemed to have missed any 14-day period in which to declare the proposal deficient.

On December 3 – just six days after Chevedden purported to complete the submission of his proposal on November 27 – Apache responded that Chevedden's broker letter from RAM Trust Services was not sufficient under Rule 14a-8(b), advised that Chevedden had 14 days to correct the deficiency," and enclosed a copy of Rule 14a-8. (X-3). Later that day, Chevedden responded that "rule 14a-8 is believed to state that a company must notify the proponent of any defect within 14-days of the receipt of a rule 14a-8 proposal – which was already acknowledged by the company to be almost a month ago." (X-4).

On December 8, Apache responded and explained that, while it "did receive your initial shareholder proposal on November 9, 2009," it "did not receive your submission of proof of ownership until November 27, 2009." (X-5). Apache explained that Rule 14a-8(b)(2) states that "**at the time you submit your proposal, you must prove your eligibility to the company**" and went on to explain that

> *The Company did not receive your completed submission until November 27, 2009, the date you provided us with the letter from RAM Trust Services, which was intended to demonstrate that you satisfy the minimum ownership requirements of Rule 14a-8. It was then that the Company notified you of the defect in your submission by letter dated December 3, 2009, which was sent to*

*you within 14 days of our receipt of your completed submission.*  As we stated in the defect letter, neither you, nor RAM Trust Services, are listed as a record holder of Apache stock.  Therefore, you have 14 calendar days from the date of that letter to provide us with a written statement from the record holder of the shares you beneficially own verifying that you continually have held the required amount of Apache common stock for at least one year as of the date of your submission of the proposal.  Failure to meet this deadline may result in your proposal being excluded from Apache's 2010 proxy statement.

(X-5) (bold and underlining in original).  Thus, as provided in Rule 14a-8(f), Apache gave Chevedden 14 days, running from Apache's December 3 letter, to provide the proof of shareholder status and eligibility as required under Rule 14a-8(b).

On December 10, Chevedden responded and, notably, did *not* dispute Apache's explanation, did *not* dispute that Apache's December 3 deficiency notice was timely, did *not* dispute that he had 14 days from December 3 to correct the deficiency and, for that matter, did *not* dispute that the letter from Ram Trust Services failed to satisfy Rule 14a-8(b)(2)(i)'s requirement that the written statement come from the "record" holder itself.  Instead, Chevedden attached a *different letter* from Ram Trust Services and asked that Apache "Please advise tomorrow whether there are now any rule 14a-8 open items."  (X-6).

Rule 14a-8(2)(b) provides, and informs purported shareholders, that "*at the time you submit your proposal, you must prove your eligibility to the company . . . ."*  For whatever reason, Chevedden staggered his submissions to Apache, and only after sending his "unprompted" – November 27 email, did Chevedden ask "whether there now are any rule 14a-8 open items."  (X-6).

Chevedden's submission to Apache was complete – albeit, still deficient – on November 27, 2009.  Apache timely sent Chevedden a deficiency notice on December 3, just six days later, and well within the allowed 14 days.

B.   Companies with Tardy Deficiency Notices Still May Exclude Deficient Proposals

Even if Apache's December 3 deficiency notice had been tardy – it was not – Apache still would be entitled to exclude Chevedden's proposal.   Rule 14a-8(f) expressly provides that a shareholder's failure to cure within 14 days may result in exclusion. *See* Rule 14a-8(f) ("What if I fail to follow one of the eligibility or procedural requirements explained in answers to Questions 1 through 4 of this section?   *The company may exclude your proposal* . . . .").   Rule 14a-8(f) does not, however, provide that a company waives or is otherwise precluded from exercising its right to dispute and exclude a deficient proposal if it fails to send a deficiency notice within 14 days.

Rule 14a-8(f) certainly does provide that "Within 14 calendar days of receiving your proposal, the company must notify you in writing of any procedural or eligibility deficiencies, as well as of the time frame for your response."   But Rule 14a-8(f) does not say *what happens* if a company sends its deficiency notice more than 14 days after receiving the proposal.   The fact that the rule expressly provides for exclusion if shareholders miss their 14 day deadline to respond to a deficiency notice, but does not similarly provide for waiver if companies miss their 14 day deadline to issue a deficiency notice, is a strong indication that waiver does not result. The SEC knew how to specify waiver or other preclusion if that had been its intent.

We have identified three instances in which the SEC staff has considered the effect of companies issuing deficiency notices after Rule 14a-8(f)'s 14 day period has expired.   The SEC staff's no-action letters are informative.   First and most recently, in *Exelon Corp.* (Feb. 23, 2009), the SEC staff considered Exelon's intention to exclude a shareholder proposal based on eligibility deficiencies under Rule 14a-8(b).   Exelon missed Rule 14a-8(f)'s 14 day period and, instead, first notified the proponent of the eligibility deficiency *two months and nine days* after receipt of the proposal.   Exelon argued in its no-action request letter that:

> The *Proponents were in no way affected or prejudiced by Exelon's failure to provide written notice of the deficiencies within Rule 14a-8(f)'s 14-day period since such did not shorten the period for the Proponents to correct the deficiency*, Exelon repeatedly notified the Proponents of the deficiencies, and the Proponents received verbal notification of the deficiencies within the requisite period. *The Proponents were given ample opportunity to correct the procedural and eligibility deficiencies of the September Letter, but they failed to do so.*

*Id.*[9]  The SEC staff agreed that there "appears to be some basis for your view that Exelon may exclude the proposal under Rule 14a-8(f)."  The staff noted that Exelon gave the proponents the full 14 days to try to correct the deficiency and that the proponents still failed to do so.

Second, in *Dell Computer* (Apr. 5, 2002), the SEC staff agreed that there "appears to be some basis for your view that Dell may exclude the proposal under Rule 14a-8(b)" even though Dell did not send its deficiency notice until ***three months and eleven days*** after receipt of the proposal.   The staff noted that the proponent had not responded to Dell's request for documentary support of eligibility.  Unlike what Chevedden did here, the proponent in Dell submitted his proposal in a single letter, and not through two or more staggered letters separated in time.

Third, in *Battle Mountain Gold Company* (Mar. 24, 2000), the SEC staff disagreed with the company's right to exclude an otherwise eligibility-deficient proposal because, as the staff put it, "We note in particular that Battle Mountain Gold did not notify the proponent of the eligibility defect until over ***seven months*** after receipt of the proposal."   Again, unlike Chevedden did here, the proponent in Battle Mountain submitted his proposal in a single letter, and not through two or more staggered letters separated in time.

---

[9] In its no-action request letter, Exelon had noted that it had made a phone call to one of the two proponents and orally advised him of the deficiency, and also argued that the proposal should be excluded for other reasons as well.  The SEC staff did not consider these arguments, noting that "we have not found it necessary to address the alternative bases for omission upon which Exelon relies." *Id.*

Even if Rule 14a-8(b)(2)'s "at the time you submit your proposal" language and the unusual staggered nature of Chevedden's proposal to Apache here is ignored and Chevedden is deemed to have submitted his proposal on November 8, 2009, Chevedden still did not suffer any prejudice.  As with the proponent in *Exelon*, Chevedden was given the full 14-day period to correct the eligibility deficiencies with his proposal, and still failed to do so.  In fact, Chevedden did not need the full 14 days, and responded to Apache's December 3 deficiency notice in just seven days and, on December 10, sent Apache another (albeit, still deficient) broker letter. Further, Apache's December 3 deficiency notice was sent just *25 days* after receiving Chevedden's November 8 letter – much quicker than the two months and nine days in *Exelon*, the three months and eleven days in *Dell*, and the seven months in *Battle Mountain*.

Apache's December 3, 2009 deficiency notice was timely and effective.

V.

Conclusion

This Court should declare that Apache properly may exclude Chevedden's proposal from Apache's proxy materials in accordance with Rule 14a-8(b) and (f) promulgated under the Securities Exchange Act of 1934.

Dated:  February 15, 2010

Respectfully submitted,

/s/ Geoffrey L. Harrison
Geoffrey L. Harrison
Attorney-in-Charge
Texas State Bar No. 00785947
SD/TX Admissions No. 16690
Chanler A. Langham
Texas State Bar No. 24053314
SD/TX Admissions No. 659756
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, #5100
Houston, TX  77002
Tel.:  (713) 651-9366
Fax:  (713) 654-3367
E-mail:  gharrison@susmangodfrey.com
E-mail:  clangham@susmangodfrey.com

*Attorneys for Plaintiff Apache Corporation*

Certificate of Service

I certify that on February 15, 2010, this pleading electronically was transmitted to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to ECF registrants.  A copy of this pleading also is being provided to defendant Chevedden by email sent to the email address Chevedden has used to communicate with Apache, with the SEC, and with the Court's Case Manager in this case:  olmsted7p@earthlink.net.

/s/ Geoffrey L. Harrison
Geoffrey L. Harrison

1004723v1/011803

26