**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| APACHE CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-0076 |
| | § | |
| JOHN CHEVEDDEN, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This court is asked to decide whether the proof of stock ownership that John Chevedden submitted to Apache Corporation satisfies the requirements of S.E.C. Rule 14a-8(b)(2). This rule requires a shareholder submitting a proposal for the company to include in its proxy materials to prove that he is eligible. A company may exclude a shareholder proposal from its proxy materials if the shareholder fails to present timely and adequate proof of eligibility. Apache seeks a declaratory judgment that it may exclude a proposal submitted by Chevedden from the proxy materials it will distribute to shareholders before Apache's annual shareholder meeting on May 6, 2010. The only issue is whether Chevedden has met the requirements for showing stock ownership under S.E.C. Rule 14a-8(b)(2), 17 C.F.R. § 240.14a-8(b)(2).

Chevedden is not listed as a shareholder in Apache's records. Chevedden sent Apache four letters, three from Ram Trust Services ("RTS"), which Chevedden asserts is his "introducing broker," certifying that Chevedden was the beneficial owner of Apache stock, and another from Northern Trust Company, certifying that it held Apache stock as "master custodian" for RTS. Northern Trust is a participating member of the Depository Trust Company ("DTC"). In its "nominee name," Cede & Co., the DTC is listed as the owner of Apache's shares in the company's

records.  Apache's records do not identify the beneficial owners of the shares held in the name of Cede & Co.  Chevedden argues that Rule 14a-8(b)(2) was satisfied by a letter from RTS, his "introducing broker."  *Id.*  Apache argues that Rule 14a-8(b)(2) required Chevedden to prove his stock ownership by obtaining a confirming letter from the DTC or by becoming a registered owner of the shares.  Apache has moved for a declaratory judgment that it may exclude Chevedden's shareholder proposal from the proxy materials because he failed to do either.  (Docket Entry No. 11). Chevedden has responded and asked for a declaratory judgment that his proposal met the Rule 14a-8(b)(2) requirements.  (Docket Entry No. 17).[1]  Apache has replied.  (Docket Entry No. 18).

Based on the motion, response, and reply; the record; and the applicable law, this court grants Apache's motion for declaratory judgment and denies Chevedden's motion.  The ruling is narrow. This court does not rule on what Chevedden had to submit to comply with Rule 14a-8(b)(2). The only ruling is that what Chevedden did submit within the deadline set under that rule did not meet its requirements.

The reasons for this ruling are explained below.

## I.  Background

### A.  Proof of Securities Ownership

It has been decades since publicly traded companies printed separate certificates for each share, sold them separately to the individual investors, kept track of subsequent sales of the shares, and maintained comprehensive lists identifying the shareholders, the number of the shares they held, and the duration of their ownership.  Nor are securities certificates any longer traded directly by brokers on exchanges, with the shares recorded in the brokers' "street name" in a company's

---

[1]At a hearing held on February 11, Chevedden objected to this court exercising personal jurisdiction over him.  (Docket Entry No. 10).  Apache filed a brief on that issue.  (Docket Entry No. 12).  In his brief on the merits, however, Chevedden stated that he is no longer challenging personal jurisdiction.  (Docket Entry No. 17).

records. The volume, speed, and frequency of trading required a different system.  In 1975, Congress, amended the Securities Exchange Act of 1934.  The amendments were based on four explicit findings:

> (A) The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors.

> (B) Inefficient procedures for clearance and settlement impose unnecessary costs on investors and persons facilitating transactions by and acting on behalf of investors.

> (C) New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement.

> (D) The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors.

15 U.S.C. § 78q-1(a)(1).  Congress directed the S.E.C. to create a "national system for prompt and accurate clearance and settlement in securities."  15 U.S.C. § 78q-1(a)(2)(A)(i).  Clearing agencies became subject to S.E.C. regulation and uniform procedures.  After the amendments were passed, the two national securities exchanges—the New York Stock Exchange and  the American Stock Exchange—as well as, the National Association of Securities Dealers, which operated the over-the-counter trading market, merged their subsidiary clearing agencies into one larger entity, called the National Securities Clearing Corporation ("NSCC").  The S.E.C. permitted the NSCC to register as a clearing agency, provided that it established links with the regional clearing agencies.  The S.E.C. found that this was "an essential step toward the establishment, at an early date, of a comprehensive

network of linked clearance and settlement systems and branch facilities with the national scope, efficiencies and safeguards envisioned by Congress in enacting the 1975 Amendments."[2]

A parallel development to centralizing clearing operations was the establishment of the Depository Trust Company ("DTC") in 1973.  The DTC is the nation's only securities depository.[3] A securities depository is "a large institution that holds only the accounts of 'participant' brokers and banks and serves as a clearinghouse for its participants' securities transactions."  *Delaware v. New York*, 507 U.S. 490, 495, 113 S. Ct. 1550 (1993).  Although the DTC is also an S.E.C.-registered clearing corporation, 3 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 14.2[2], at 99 n. 48, its primary purpose is to improve trading efficiency by "immobilizing" securities, or retaining possession of securities certificates even as they are traded.  According to its website, the DTC holds nearly $34 trillion worth of securities in participants' accounts.  When a securities transaction occurs, the DTC changes, in its own records, which participant broker or bank "owns" the securities.  The company's records, however, reflect that these securities are owned in street name, under the DTC's "nominee name" of Cede & Company.  *Delaware*, 507 U.S. at 495, 113 S. Ct. 1550; *In re Color Tile Inc.*, 475 F.3d 508, 511 (3d Cir. 2007).  Neither the company nor the DTC records the identity of the beneficial owner of the shares unless that owner is registered as such.

One result—and major advantage—of this process is "netting."  Participating brokers that have engaged in multiple transactions in the same securities in a trading day will report only the net

---

[2]In the Matter of the Application of the National Securities Clearing Corporation for Registration as a Clearing Agency, Release No. 13163, File No. 6000-15, 1977 WL 173551 (Jan. 13, 1977).

[3]Marcel Kahan & Edward Rock, *The Hanging Chads of Corporate Voting*, 92 GEO. L.J. 1227, 1238 n. 50 (2008).

change in their ownership to the DTC.[4]  The DTC and the NSCC are now subsidiaries of the same

holding company, the Depository Trust & Clearing Corporation ("DTCC").  The functions of each

entity are integrated as well.  "The changes in beneficial ownership of securities resulting from

transactions that are cleared and settled at NSCC are implemented by book-entry transfers among

brokers' accounts at DTC." *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539

F.3d 1159, 1163 (9th Cir. 2008).  Cede & Co. is the shareholder of record for a substantial majority

of the outstanding shares of all publicly traded companies.  *See In re FleetBoston Financial Corp.*

*Securities Litigation*, 253 F.R.D. 315, 345 n. 32 (D.N.J. 2008) (quotations omitted).

There is at least one intermediary between the DTC and a retail investor such as Chevedden.

A participating broker or bank sells securities to the DTC; a participating broker or bank on the other

side buys from the DTC.  A retail investor could be a direct client of the participating broker or

bank, in which case the DTC and the participating broker or bank are the only intermediaries

between the investor and the company.  Frequently, however, there is a third financial institution,

an "introducing" broker, which serves as an intermediary between the retail investor and the

participating broker or bank.

One important part of this system is the Non-Objecting Beneficial Shareholders ("NOBO")

list.  When a company's shares are held in street name, S.E.C. rules require the DTC to provide the

company, upon request, with a list of participants that hold its stock.  Once the company has this

DTC participant list, called a "Cede breakdown," it asks the participating banks and brokers on it

to submit the names of beneficial owners to the company.  This second list is the NOBO list.  This

is typically done through a centralized intermediary,  Broadridge Financial Solutions, Inc., which

---

[4]Gene N. Lebrun & Fred H. Miller, *The Law of Letters of Credit and Investment Securities Under the UCC–Modernization and Process*, 43 S.D. L. REV. 14, 28 (1998).

compiles the NOBO list.  Beneficial owners may exclude themselves from this list by objecting, which is why the list includes only "Non-Objecting" shareholders.  The NOBO list includes the name, address, and ownership position of each nonobjecting beneficial owner.  The NOBO list is used to communicated with shareholders, primarily to distribute proxy materials .  *See* 17 C.F.R. § 240.14b-1; *Sadler v. NCR Corp.*, 928 F.2d 48, 50 (2d Cir. 1991).[5]  Approximately 75% of beneficial owners object to disclosing their information to the company.[6]  But while the majority of institutional shareholders object to the disclosure, according to one report, an estimated 75% of individual shareholders do not object to inclusion on the list.[7]  Nonetheless, the company will never discover the identity of many of its beneficial owners.  The company must communicate with those shareholders through Broadridge and the intermediary financial institutions.

## B.    Shareholder Proposals

Before a public company holds its annual shareholders' meeting, it must distribute a proxy statement to each shareholder.  A proxy statement includes information about items or initiatives on which the shareholders are asked to vote, such as proposed bylaw amendments, compensation or pension plans, or the issuance of new securities.  2 HAZEN, *supra*, § 10.2, at 83-90.  The proxy card, on which the shareholder may submit his proxy, and the proxy statement together are the "proxy materials."  *See* 17 C.F.R. § 240.14a-8(j).

Within this framework, the rules governing proxy solicitation for director voting are different than those governing proxy solicitation for voting on other proposals.  *See* 17 C.F.R. §

---

[5]*See also* Alan L. Beller & Janet L. Fisher, *The OBO/NOBO Distinction in Beneficial Ownership, Council of Institutional Investors* (Feb. 2010), *available at* http://www.cii.org.

[6]Kahan & Block, *supra* note 3, at 75.

[7] Katten Munchin Rosenman LLP, *Frequently Asked Questions Regarding the SEC's NOBO-OBO Rules and Companies' Ability to Communicate with Retail Shareholders*, *available at* http://www.kattenlaw.com.

240.14a-8(i)(6).  This case involves a proposed shareholder resolution.  A shareholder wishing to submit a proposed shareholder resolution may solicit proxies in two ways.  First, he may pay to issue a separate proxy statement, which must satisfy all the disclosure requirements applicable to management's proxy statement.  *See* HAZEN, *supra*, § 10.2, at 85-89.  Second, a shareholder may force management to include his proposal in management's proxy statement, along with a statement supporting the proposal, at the company's expense.  *See id.* § 10.8[1][A] at 136-37.  Regulations promulgated under the Securities Exchange Act of 1934 apply to this second method.  *See* 17 C.F.R. § 240.14a-8 ("This section addresses when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders.").

Rule 14a-8 is written in a question-and-answer format.  It informs shareholders that "in order to have your proposal included on a company's proxy card, and included along with any supporting statement in its proxy statement, you must be eligible and follow certain procedures.  Under a few specific circumstances, the company is permitted to exclude your proposal, but only after submitting its reasons to the [S.E.C.]."  *Id.*

Many of these reasons for exclusion are substantive.  Among other reasons, a proposal may be excluded if it would cause the company to violate the law, if it relates only to a personal grievance against the company, if it is beyond the company's authority, or if it relates to the company's "ordinary business operations."  17 C.F.R. § 240.14a-8(i).  The company may also exclude proposals that violate the procedural requirements set out in the S.E.C. rules.  These procedural requirements include a 500-word limit, a filing deadline, and a limit to one proposal per shareholder per meeting.  17 C.F.R. § 240.14a-8(c)-(e).  Finally, the company may exclude a proposal if the submitter does not satisfy the eligibility requirements.  The requirements limit those

7

submitting proposals to holders of "at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting." 17 C.F.R. § 240.14a-8(b)(1). The shareholder must have owned at least that amount of securities continuously for one year as of the date he submits the proposal to the company and must continue to do so through the date of the shareholder meeting. *Id.*

Rule 14a-8(b)(2) sets out two ways for a shareholder who is not a registered owner to establish eligibility. Only the first of those ways is relevant here. The rule states:

> If you are the registered holder of your securities, which means that your name appears in the company's records as a shareholder, the company can verify your eligibility on its own, although you will still have to provide the company with a written statement that you intend to continue to hold the securities through the date of the meeting of shareholders. However, *if like many shareholders you are not a registered holder, the company likely does not know that you are a shareholder, or how many shares you own*. In this case, at the time you submit your proposal, *you must prove your eligibility* to the company in one of two ways [only the first of which is relevant]:
>
> > (i) The first way is to submit to the company a *written statement from the "record" holder of your securities (usually a broker or bank)* verifying that, at the time you submitted your proposal, you continuously held the securities for at least one year. You must also include your own written statement that you intend to continue to hold the securities through the date of the meeting of shareholders. . . .

17 C.F.R. § 240.14a-8(b)(2) (emphasis added).[8]

If a shareholder's proposal is procedurally deficient or the shareholder has not submitted proper proof of ownership, the company may exclude it only after giving the shareholder notice and

---

[8]The Rule was amended in 1998, to recast it in question-and-answer format. This amendment added the "usually a bank or broker" language. The prior amendment, in 1987, was accompanied by a note stating that a shareholder should submit " a written statement by a record owner or an independent third party, such as a depository or broker-dealer holding the securities in street name." S.E.C. Release No. 34-25217, 52 FR 489 48977-01, 1987 WL 153779 (Dec. 29, 1987). The notes to the 1998 amendment did not state that a substantive change to Rule 14a-8(b)(2) was intended. S.E.C. Release No. 34-40018, 63 FR 29106-01, 1998 WL 266441 (May 28, 1998).

an opportunity to correct the deficiency.  17 C.F.R. § 240.14a-8(f)(1).  The company must notify the shareholder of the problem in writing within 14 days of receiving the proposal and inform the shareholder that he has 14 days to respond.  *Id.*  If after the response date the company decides to exclude a proposal, it must notify the S.E.C. of its reasons for doing so no later than 80 days before the company files its proxy materials with the S.E.C.  17 C.F.R. § 240.14a-8(j).  The shareholder is entitled to file with the S.E.C. his arguments for including the proposal.  17 C.F.R. § 240.14a-8(k).  The burden is on the company to demonstrate to the S.E.C. that the proposal is properly excluded.  17 C.F.R. § 240.14a-8(g).

A company may ask the S.E.C. Department of Corporate Finance staff for a no-action letter to support the exclusion of a proposal from proxy materials.  Although no-action letters are not required, "virtually all companies that decide to omit a shareholder proposal seek a no-action letter in support of their decision."[9]  The S.E.C. receives hundreds of requests for no-action letters each year.  HAZEN, *supra*, § 10.8[1][A], at 138.  The company submits the proposal and its reasons for exclusion to the S.E.C. staff, seeking a letter stating that the staff will not recommend enforcement action to the S.E.C. if the company chooses to exclude the proposal.  The shareholder often responds with his own submission.  The staff will issue a brief letter stating either that it will not recommend enforcement action ("no action") or that it is "unable to concur" with the company.  This advice comes with a lengthy disclaimer, entitled "Division of Corporate Finance Informal Procedures Regarding Shareholder Proposals."  (Docket Entry No. 11, Ex. 11).  It states:

> The Division of Corporation Finance believes that its responsibility
> with respect to matters arising under Rule 14a-8 [17 CFR 240.14a-8],
> as with other matters under the proxy rules, is to aid those who must

---

[9] Donna M. Nagy, *Judicial Reliance on Regulatory Interpretation in S.E.C. No-Action Letters: Current Problems and a Proposed Framework*, 83 CORNELL L. REV. 921, 989 (1998).

comply with the rule by offering informal advice and suggestions and to determine, initially, whether or not it may be appropriate in a particular matter to recommend enforcement action to the Commission. In connection with a shareholder proposal under Rule 14a-8, the Division's staff considers the information furnished to it by the Company in support of its intention to exclude the proposals from the Company's proxy materials, as well as any information furnished by the proponent or the proponent's representative.

Although Rule 14a-8(k) does not require any communications from shareholders to the Commission's staff, the staff will always consider information concerning alleged violations of the statutes administered by the Commission, including argument as to whether or not activities proposed to be taken would be violative of the statute or rule involved. The receipt by the staff of such information, however, should not be construed as changing the staff's informal procedures and proxy review into a formal or adversary procedure.

It is important to note that the staff's and Commission's no-action responses to Rule 14a-8(j) submissions reflect only informal views. The determinations reached in these no-action letters do not and cannot adjudicate the merits of a company's position with respect to the proposal. Only a court such as a U.S. District Court can decide whether a company is obligated to include shareholder proposals in its proxy materials. Accordingly a discretionary determination not to recommend or take Commission enforcement action, does not preclude a proponent, or any shareholder of a company, from pursuing any rights he or she may have against the company in court, should the management omit the proposal from the company's proxy material.

(*Id.*).

### C.     Chevedden's Proposal

The events giving rise to this dispute began on November 8, 2009, when Chevedden, a retired Hughes Aircraft employee living in Redondo, Beach, California, sent an e-mail to Cheri Peper, the Corporate Secretary of Apache Corporation.  (Docket Entry No. 11, Ex. 1).  Apache is an oil and gas company based in Houston and incorporated in Delaware.  The November 8 e-mail

attached a "Rule 14a-8 Proposal" and a cover letter.  The cover letter was addressed to Raymond

Plank, Apache's Chairman, and stated:

> This Rule 14a-8 proposal is respectfully submitted in support of the long-term performance of our company.  This proposal is submitted for the next annual shareholder meeting.[10]  Rule 14a-8 requirements are intended to be met including the continuous ownership of the required stock value until after the date of the respective shareholder meeting and presentation of the proposal at the annual meeting.  This submitted format, with the shareholder-supplied emphasis, is intended to be used for definitive proxy publication.
>
> In the interest of company cost savings and improving the efficiency of the rule 14a-8 process please communicated via email to olmsted7p (at) earthlink.net.
>
> Your consideration and the consideration of the Board of Directors is appreciated in support of the long-term performance of our company.  Please acknowledge receipt of this proposal promptly by email to olmsted7p (at) earthlink.net.

(*Id.* at 2).  The proposal was a shareholder resolution that "our board take the steps necessary so that

each shareholder voting requirement in our charter and bylaws, that calls for a greater than simple

majority vote, be changed to a majority of the votes cast for and against the proposal in compliance

with applicable laws."  (*Id.* at 3).  The resolution called for changing the 80% supermajority

requirements for amending particular provisions of the charter and bylaws.  (*Id.*).  The record does

not show an Apache response to this e-mail.

Chevedden sent another Apache another e-mail on Friday, November 27, 2009, this time

copying the Office of the Chief Counsel in the S.E.C.'s Division of Corporate Finance.  (*Id.*, Ex. 2

at 1).  Chevedden wrote: "Please see the attached broker letter.  Please advise on Monday whether

there are now any rule 14a-8 open items."  (*Id.*).  The attached broker letter, on the letterhead of Ram

---

[10]Apache's 2010 annual shareholders' meeting is scheduled for May 6, 2010 in Houston.

Trust Services ("RTS"), was dated November 23, 2009 and signed by Meghan M. Page, Assistant

Portfolio Manager.  It stated:

> To Whom it May Concern,
>
> I am responding to Mr. Chevedden's request to confirm his position in several securities held in his account at Ram Trust Services. Please accept this letter as confirmation that John R. Chevedden has continuously held no less than 50 shares of the following security since November 7, 2008:
>
> •    Apache Corp (APA)

(*Id.* at 2).

On December 3, 2009, Peper sent Chevedden a letter, presumably by fax or e-mail.  (*Id.*, Ex.

3).  The letter informed Chevedden that Apache had received his November 8 letter and the RTS

letter.  The letter stated:

> Based on our review of the information provided by you, our records and regulatory materials, we have been unable to conclude that the proposal meets the requirements for inclusion in Apache's proxy materials, and unless you can demonstrate that you meet the requirements in the proper time frame, we will be entitled to exclude your proposal from the proxy materials for Apache's 2010 annual meeting.
> . . .
>
> [W]e have been unable to confirm your current ownership of Apache stock, or the length of time that you have held the shares.
>
> Although you have provided us with a letter from RAM Trust Services, the letter does not identify the record holder of the shares or include the necessary verification.  Apache has reviewed the list of record owners of the company's common stock, and neither you, nor RAM Trust Services are listed as an owner of Apache common stock.  Pursuant to the SEC Rule 14a-8(b), since neither you nor RAM Trust Services is a record holder of the shares you beneficially own verifying that you continually have held the required amount of Apache common stock for at least one year as of the date of your submission of the proposal.  As required by Rule 14a-8(f), you must provide us with this statement within 14 days of your receipt of this

> letter.  We have attached to this notice of defect a copy of Rule 14a-8
> for your convenience.

(*Id.* at 1-2).  It is undisputed that neither Chevedden nor RTS appears on Apache's list of registered

holders of common stock.

Chevedden responded to the letter by e-mail the same day, again copying the Division of

Corporate Finance.  The e-mail cited Rule 14a-8, which Chevedden "believed to state that a

company must notify the proponent of any defect with 14-days of the receipt of a rule 14a-8

proposal – which was already acknowledged by the company to be almost a month ago." (*Id.*, Ex.

4).  Peper  responded on December 8, 2009, disagreeing with Chevedden's characterization of the

14-day rule.  Peper referred to the language in Rule 14a-8(b)(2) stating that a shareholder must

establish his eligibility at the time he submits his proposal, meaning that the 14-day period did not

begin until Chevedden completed his submission by sending the November 23 RTS letter on

November 27.  Apache's December 3 response was within 14 days of that date.  Peper then

reminded Chevedden that, within 14 days of the December 3 defect letter, he had to submit "a

written statement from the record holder of the shares you beneficially own verifying that you

continually have held the required amount of Apache common stock for at least one year as of the

date of your submission of the proposal." (*Id.*, Ex. 5).

On December 10, 2009, Chevedden sent Peper another e-mail, without copying the S.E.C.

staff.  This e-mail directed Peper to "see the attached broker letter" and to "advise tomorrow whether

there are now any rule 14a-8 open items." (*Id.*, Ex. 6 at 1).  The attached letter was dated December

10 and again signed by Meghan Page of RTS.  It stated:

> To Whom it May Concern,
>
> As introducing broker for the account of John Chevedden, held with
> Northern Trust as custodian, Ram Trust Services confirms that John

Chevedden has continuously held no less than 50 shares of the following security since November 7, 2008:

• Apache Corp (APA)

(*Id.* at 2).  It is undisputed that Northern Trust is not a registered shareholder listed in Apache's records.

On January 8, 2010, Apache sent notice to the S.E.C. staff (and to Chevdedden) that it intended to exclude Chevedden's proposal from its proxy materials for the 2010 annual meeting. Apache informed the staff that "[b]ecause an introducing broker is not a record holder of the shares of a company, the Company intends to exclude this proposal unless a U.S. District Court rules that the Company is obligated to include it in its 2010 Proxy Materials."  (*Id.*, Ex. 7).  Rather than seek a no-action letter from the staff, Apache filed this lawsuit the same day.  The S.E.C. staff will not provide no-action letters when litigation is pending.[11]  (Docket Entry No. 1).

On January 11, Chevedden sent the S.E.C. staff a response to Apache's letter.  He attached the December 10 RTS letter and stated that it "appears to be consistent with the attached precedent of [the no-action letter issued in] *The Hain Celestial Group, Inc.* (October 1, 2008)."  (*Id.*, Ex. 8). As discussed more fully below, in *Hain Celestial*, the S.E.C. staff stated that "we are now of the view that a written statement from an introducing broker-dealer constitutes a written statement from the 'record' holder of securities, as that term is used in rule 14a-8(b)(2)(i)."  Apache had attached the December 10 letter as an exhibit to its submission to the S.E.C. staff and, in its submission, had attempted to distinguish the *Hain Celestial* no-action letter.  (*Id.*, Ex. 7).

---

[11] Securities and Exchange Commission, Division of Corporate Finance Staff Legal Bulletin No. 14 (July 13, 2001), *available at* http://www.sec.gov/interps/legal/cfslb14.htm.

On January 22, 2010, Carolyn Haynes, an RTS Executive Assistant, e-mailed Peper two

letters.  The first was from Meghan Page of RTS, addressed to Peper and dated January 22.  Page

wrote:

> John R. Chevedden owns no fewer than 50 shares of Apache
> Corporation (APA) and has held them continuously since November
> 7, 2008.
>
> Mr. Chevedden is a client of Ram Trust Services ("RTS").  RTS acts
> as his custodian for these shares.  Northern Trust Company, a direct
> participant in the Depository Trust Company, in turn acts as master
> custodian for RTS.  Northern Trust is a member of the Depository
> Trust Company whose nominee name is Cede & Co.
>
> Mr. Chevedden individually meets the requirements set forth in rule
> 14a-8(b)(1).  To repeat, these shares are held by Northern Trust as
> master custodian for RTS.   All of the shares have been held
> continuously since at least November 7, 2008, and Mr. Chevedden
> intends to continue to hold such shares through the date of the Apache
> Corporation 2010 annual meeting.
>
> I enclose a copy of Northern Trust's letter dated January 22, 2010 as
> proof of ownership in our account for the requisite time period. Please
> accept this telefax copy as the original was sent directly to you from
> Northern Trust.

(*Id.*, Ex. 9 at 2).  The Northern Trust letter, signed by Rhonda Epler-Staggs, was also dated January

22 and addressed to Peper.  It stated:

> The Northern Trust Company is the custodian for Ram Trust
> Services.  As of November 7, 2009, Ram Trust Services held 183
> shares of Apache Corporation CUSIP# 037411105.
>
> The above account has continuously held at least 50 shares of Apache
> common stock for the period of November 7, 2008 through January
> 21, 2010.
>
> Northern Trust is a member of the Depository Trust Company whose
> nominee name is Cede & Co.

15

(*Id.* at 3).  The parties agree that Apache has not received any letter from the DTC or Cede & Co.,
the registered owner of any Apache stock Chevedden owns.  There is nothing in the record to
suggest that Apache attempted to obtain a NOBO list to determine whether Chevedden was
included.  Apache has submitted into the record two lists it obtained from the DTC.  These are
"Cede breakdowns," one from March 18, 2009 and the other from March 5, 2010, of DTC
participating brokers or banks that hold Apache stock on behalf of beneficial owners or on behalf
of brokers and their beneficial owners.  (Docket Entry No. 18, Exs. 26, 27).  Northern Trust appears
on both lists.  RTS is not a participant in the DTC and as a result is not included on the list.
Beneficial owners are also not included.

Because of the impending annual meeting, this case has proceeded on an expedited basis.
After filing its complaint on January 8, 2010, Apache filed a motion for a speedy hearing on January
14, informing this court that the proxy materials had to be finalized by March 10, 2010.  (Docket
Entry No. 3).  At the hearing, this court overruled Chevedden's objection to the method of service
and set a briefing schedule.  (Docket Entry Nos. 10, 14).  The parties complied.

Apache filed briefs on February 15, 2010.  (Docket Entry Nos. 11, 12).  Chevedden
responded on March 4, 2010.  (Docket Entry No. 17), stating that he was no longer contesting
personal jurisdiction.  In the response, Chevedden did not argue that Apache's deficiency notice was
untimely.  With this court's permission, the United States Proxy Exchange filed an *amicus curiae*
brief on March 5, 2010.  (Docket Entry No. 19).  Apache filed a reply.  (Docket Entry No. 20).  On
March 10, 2010, Chevedden submitted a brief styled as a "Motion for Summary Judgment" to this
court's case manager by e-mail, with a copy to Apache.  Apache filed a response the same day.
(Docket Entry No. 20).  The only issue before this court is whether, under Rule 14a-8, Chevedden

16

has provided Apache with proper proof of his eligibility to submit proposals.  If he has, Apache must include the proposal in its proxy materials.

## II.      Analysis

Because most Rule 14a-8 disputes are resolved cooperatively or through the no-action process, there is little case law.  *See* 2 HAZEN, *supra*, § 10.8[1][A], at 138.  Indeed, the parties have not identified, and research has not revealed, judicial opinions deciding what proof of stock ownership is required for eligibility under Rule 14a-8(b)(2).  In this case, unlike others, *see Apache Corp. v. New York City Employees Ret. Sys.*, 621 F. Supp. 2d 444 (S.D. Tex. 2008), the S.E.C. has not been asked to issue a no-action letter.  In presenting their arguments, the parties rely on four sources of authority: the Rule; S.E.C. staff legal bulletins; S.E.C. staff no-action letters; and the policy reasons for the Rule.

The text of Rule 14a-8(b)(2), in its question-and-answer format, instructs a shareholder who is not "the registered holder" that "you must prove your eligibility to the company."  17 C.F.R. 240.14a-8(b)(2).  The parties agree that Chevedden is not the registered holder of his shares.  The rule instructs him to "submit to the company a written statement from the 'record' holder of [his] securities (usually a broker or bank) verifying that" he satisfies the eligibility requirements.  *Id.* Apache argues that the unambiguous meaning of this language is that shareholders must submit a letter from the entity actually registered on the company's books.  Under this interpretation, Chevedden would have to obtain a letter from the DTC or Cede & Co.

Chevedden points to the language explaining that a "record" holder is "usually a broker or bank."  Neither the DTC nor Cede & Co., which "usually" is the registered owner named on a company's shareholder list, is a broker or bank.  This suggests that Apache's reading of the word

17

"record" is too narrow.  The parenthetical statement that the "'record' holder" is usually a broker or bank is inconsistent with reading the rule to require a letter from the DTC or Cede & Co.[12]  It also weighs against Apache's interpretation that the Rule uses the word "registered" to describe shareholders who do not need take any additional steps to prove eligibility.  A "registered" holder's "name appears in the company's records as a shareholder."  17 C.F.R. § 2 40.14a-8(b)(2).  If the Rule  meant that a shareholder needed a letter from the "street name" holder (usually Cede & Co.) listed in the company records, the Rule would have asked for a letter from the "registered holder," not the "'record' holder."  The Rule text does not support Apache's proposed narrow reading.[13]

The next cited source of authority is guidance issued by the S.E.C. staff.  Staff Legal Bulletin No. 14, issued on July 14, 2001, is set out in a question-and-answer format.  Section C.1.c(1) states:

> Q:     Does a written statement from the shareholder's investment adviser verifying that the shareholder held the securities continuously for at least one year before submitting the proposal demonstrate sufficiently continuous ownership of the securities?
>
> A:     The written statement must be from the *record holder of the shareholder's securities, which is usually a broker or bank*.  Therefore, unless the investment adviser is also the record holder, the statement would be insufficient under the rule.

Securities and Exchange Commission, Division of Corporate Finance Staff Legal Bulletin No. 14 (July 13, 2001) (emphasis added), *available at* http://www.sec.gov/interps/legal/cfslb14.htm.  An

---

[12]The S.E.C.'s notes to the 1987 Rule amendments provides further support for this conclusion.  It stated that, under the prior text of the Rule, proof could be supplied by a "record owner or an independent third party, such as a depository or broker-dealer holding the securities in street name."  S.E.C. Release No. 34-25217, 52 FR 489 48977-01, 1987 WL 153779 (Dec. 29, 1987).   There is no evidence that the 1998 amendments were intended to make substantive changes to this interpretation.

[13]As Apache states in its reply brief, the S.E.C. rules elsewhere provide a definition of "record holder," but limit the applicability of the definition to Rules 14a-13, 14b-1, and 14b-2.  The definition does not apply to Rule 14a-8.  17 C.F.R. § 2 40.14a-1(b)(1).

update, Bulletin No. 14B, issued on September 15, 2004, repeats the Rule language, advising companies to include the language in their notices of defect.  S.E.C., Division of Corporate Finance Staff Legal Bulletin No. 14B (Sept. 15, 2004), *available at* http://www.sec.gov/interps/legal/cfslb14b.htm.  These bulletins do not add significant clarity.  The information that an investment adviser's statement is insufficient unless the adviser is also the record holder—which, again, is "usually a broker or bank"—does not address who is a "'record' holder."

The next source of cited authority is no-action letters issued by the S.E.C. staff.  "[N]o-action letters are nonbinding, persuasive authority."  *Apache*, 621 F. Supp. 2d at 449 (noting that the proper weight to accord no-action letters was an issue of first impression in the Fifth Circuit and adopting Second Circuit precedent).[14]  Even if the S.E.C. staff has spoken, "a court must independently analyze the merits of a dispute."  *Apache*, 621 F. Supp. 2d at 449 (citing *New York City Employees' Ret. Sys. v. Brunswick Corp.*, 789 F. Supp. 144, 146 (S.D.N.Y. 1992)).  "Because the staff's advice on contested proposals is informal and nonjudicial in nature, it does not have precedential value with respect to identical or similar proposals submitted to other issuers in the future."[15]  "[R]egulatory interpretations in no-action letters may nonetheless enlighten a court struggling with ambiguous provisions in federal securities statutes or S.E.C. rules."  Nagy, *supra* note 9, at 996.  Although this court is not bound by S.E.C. staff determinations made in no-action letters, the letters are "persuasive" authority.

---

[14] *See also Amalgamated Clothing & Textile Workers Union v. S.E.C.*, 15 F.3d 254, 257 (2d Cir. 1994); Nagy, *supra* note 9, at 989 (Because "deference principles assume that the responsible administrative agency has authoritatively interpreted a regulatory provision, . . .neither *Chevron* nor *Seminole Rock* mandate judicial deference to regulatory interpretations in staff no-action letters that the Commission has neither reviewed nor affirmed." (quotations and alterations omitted)).

[15] Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals, S.E.C. Release No. 34-12599, 1976 WL 160411 (July 7, 1976).

Apache argues that the S.E.C. staff has consistently found that a letter from a broker stating that an individual or institution owned a certain amount of a specific stock on certain dates is insufficient to satisfy Rule 14a-8(b)(2).  Apache argues that when companies have asserted their intent to exclude a proposal submitted by a shareholder who has a letter from a broker not listed on the company's shareholder list, the S.E.C. staff will recommend no enforcement action.  Apache cites a number of letters that have reached this conclusion.  For example, in *JP Morgan Chase & Co*, 2008 WL 486532 (Feb. 15, 2008), Chevedden presented a proposal on behalf of Kenneth Steiner.  In response to a deficiency notice based on Rule 14a-8(b), Chevedden submitted a letter from DJF Discount Brokers stating that it was the "introducing broker for the account of Kenneth Steiner . . . held with National Financial Servcies Corp. as custodian" and certifying that Steiner met the ownership requirements.  *Id.* at *3.  The S.E.C. staff attorney found this broker letter insufficient proof of ownership under the Rule.  He wrote:

> While it appears that the proponent provided some indication that he owned shares, it appears that he has not provided a statement from the record holder evidencing documentary support of continuous beneficial ownership of $2,000, or 1% in market value of voting securities, for at least one year prior to submission of the proposal. We note, however, that JPMorgan Chase failed to inform the proponent of what would constitute appropriate documentation under rule 14a-8(b) in JPMorgan Chase's request for additional information from the proponent. Accordingly, unless the proponent provides JPMorgan Chase with appropriate documentary support of ownership, within seven calendar days after receiving this letter, we will not recommend enforcement action to the Commission if JPMorgan Chase omits the proposal from its proxy materials in reliance on rules 14a-8(b) and 14a-8(f).

*Id.* at *1.  Other no-action letters from 2008 and earlier, many issued in response to requests involving Chevedden, have also concluded that letters from introducing brokers are insufficient.  *See, e.g., Verizon Communications, Inc.*, 2008 WL 257310 (Jan 25. 2008); *MeadWestvaco Corp*,

2007 WL 817472 (Mar. 12, 2007); *Clear Channel Communications*, 2006 WL 401184 (Feb. 9, 2006); *AMR Corp.*, 2004 WL 892255 (Mar. 15, 2004).

According to Apache, the S.E.C. staff's single deviation from this consistent approach was what Apache calls the "rogue" no-action letter issued in *Hain Celestial Group*, 2008 WL 4717434, (Oct. 1, 2008).  In *Hain Celestial*, Chevedden once again wrote on behalf of Kenneth Steiner, who submitted a shareholder proposal.  The company sent a deficiency notice based on Rule 14a-8(b).  Chevedden then submitted a letter from DJF signed by its president, Mark Filberto.  The letter stated that DJF was the introducing broker for Steiner and that his shares were held by National Financial Services as custodian.  *Id.* at *5-6.  In submitting a no-action request, Hain Celestial made arguments similar to those advanced here by Apache.  Hain Celestial cited the *JP Morgan*, *Verizon*, and *MeadWestvaco* no-action letters to argue that a letter from DJF as "introducing broker" was insufficient to satisfy the "record" holder requirement.  *Id.* at *6.  The S.E.C. staff attorney issued an unusually detailed letter.  He wrote:

> We are unable to concur in your view that The Hain Celestial Group may exclude the proposal under rules 14a-8(b) and 14a-8(f). After further consideration and consultation, *we are now of the view that a written statement from an introducing broker-dealer constitutes a written statement from the "record" holder of securities, as that term is used in rule 14a-8(b)(2)(i).* For purposes of the preceding sentence, an introducing broker-dealer is a broker-dealer that is not itself a participant of a registered clearing agency but clears its customers' trades through and establishes accounts on behalf of its customers at a broker-dealer that is a participant of a registered clearing agency and that carries such accounts on a fully disclosed basis. *Because of its relationship with the clearing and carrying broker-dealer through which it effects transactions and establishes accounts for its customers, the introducing broker-dealer is able to verify its customers' beneficial ownership.* Accordingly, we do not believe that The Hain Celestial Group may omit the proposal from its proxy materials in reliance on rules 14a-8(b) and 14a-8(f).

*Id.*(emphasis added).

Apache argues that this letter is "wrong and should not be followed," that it conflicts with the "unambiguous" requirement in Rule 14a-8(b)(2), and that it is "inconsistent with the staff's long and otherwise unblemished line of no-action letters," issued before and after *Hain Celestial*.

The argument that Rule 14a-8(b)(2) is unambiguous is not persuasive. And a closer examination of S.E.C. staff letters shows that *Hain Celestial* was not a "rogue" position. The *Hain Celestial* no-action letter was neither the first or last letter in which the S.E.C. staff declined to agree that a letter from the registered owner was required under Rule 14a-8(b)(2).

In *AIG*, 2009 WL 772853 (Mar. 13, 2009), for example, the S.E.C. staff wrote that it was "unable to concur" with AIG's position that a proposal advanced by Kenneth Steiner, with Chevedden as his representative, should be excluded under Rule 14a-8(b). Chevedden had submitted a letter from DJF Discount Brokers stating that it was the "introducing broker" for Steiner, that Steiner was the beneficial owner of an appropriate amount of AIG stock for an appropriate length of time, and that National Financial Services Corp. was the "custodian" of Steiner's securities. *Id.* at *4-5. Although the S.E.C. staff did not cite *Hain Celestial*—the no-action letters rarely cite precedent—the refusal to issue a no-action letter was consistent with *Hain Celestial*. Indeed, the facts were similar.

In another *post-Hain Celestial* case in which Chevedden represented Kenneth Steiner and submitted a similar letter from DJF Discount Brokers, the S.E.C. staff also declined to issue a no-action letter. *Schering-Plough Corp.*, 2009 WL 926913 (Apr. 3, 2009). The S.E.C. staff reached the same result in two other cases in which Chevedden was a representative of shareholder proponent William Steiner and had submitted broker letters from DJF Discount Brokers. *Schering-*

*Plough Corp.*, 2009 WL 975142 (Apr. 3, 2009); *Intel Corp.*, 2009 WL 772872 (Mar. 13, 2009).  In

these three cases, the company's Rule 14a-8(b) objection was that Chevedden, who owned no

shares, was the actual proponent of the shareholder proposal, not Steiner.  In concluding that there

was no basis for exclusion under Rule 14a-8(b), the S.E.C. staff presumably would have had to find

that Steiner was the  proponent and that the broker letter was sufficient to establish his stock

ownership under Rule 14a-8(b)(2).

In an interesting post-*Hain Celestial* case not involving Chevedden, *Comerica Inc.*, 2009 WL

800002 (Mar. 9, 2009), the company sought to exclude a shareholder proposal by the Laborers

National Pension Fund because, among other reasons, the Fund had not provided adequate proof of

stock ownership.  The Fund provided a letter from U.S. Bank confirming that it held an adequate

amount of Comerica stock on behalf of the Fund as beneficial owner.  In a letter to the S.E.C., the

Fund stated:

> Comerica argues that U.S. Bank was not the record holder of any
> Company stock because the securities were held through CEDE & Co.
> This argument has consistently been rejected by the Staff and should
> be rejected here. *See Equity Office Properties Trust* (March 28, 2003);
> *Dillard Dept. Stores, Inc.* (March 4, 1999).

*Comerica Inc.*, 2009 WL 800002, at *3 (Mar. 9, 2009).  The S.E.C. staff found no basis for

excluding the proposal under Rule 14a-8(b).  The Fund's citations to earlier letters are accurate and

helpful.  In *Equity Office Properties Trust*, 2003 WL 1738866 (Mar. 28, 2003), the S.E.C. staff

found no basis for excluding a shareholder proposal from the Service Employees International

Union, which had submitted a letter from Fidelity Investments confirming that the Union was the

beneficial owner of shares "held of record by Fidelity Investments through its agent National

Financial Services."  *Id.* at *15.  The Union's letter to the S.E.C. staff observed: "Despite the nearly

universal practice by institutional shareholders of employing an agent such as the Depository Trust Company ("DTC") or NFS, the Rule indicates that the record owner from whom a statement must be obtained is usually a broker or bank. It is unlikely that the Commission was unaware of the ubiquity of agents when it drafted the Rule."  The company's letter, which failed to persuade the S.E.C. staff, argued that the Fidelity letter was insufficient because Fidelity was not the registered owner and that it was inappropriate to require the company to determine whether National Financial Services was in fact Fidelity's agent.  *Id.* at *14.

Several years earlier, in *Dillard Department Stores, Inc.*, 1999 WL 129804 (Mar. 4, 1999), the S.E.C. staff also stated that it did not believe there was a basis for exclusion under Rule 14a-8(b). The shareholder proponent in that case, an investment fund, submitted a statement from the Amalgamated Bank of New York that the fund's "shares are held of record by the Amalgamated Bank of New York through its agent, CEDE, Inc."  *Id.* at *4.  Because no letter was submitted from Cede & Co., Dillard's argued to the S.E.C. staff that there was insufficient proof of ownership.  In its letter to the S.E.C., the fund argued that it was inconsistent with the text of Rule 14a-8(b)(2) to require a letter from Cede & Co.  The argument was that because the Rule placed the term "record" in quotations and stated that the "'record' holder" would usually be a broker or bank, it would be anomalous to require a letter from Cede & Co., which is not a bank or broker and is the registered holder of most securities.  "Beneficial owners generally have a relationship with their broker or bank; requiring investors to obtain a letter from an agent of their broker or bank would needlessly complicate the process and encourage the sort of petty games-playing in which Dillard's is engaging here."  *Id.* at *3.  The S.E.C. staff sided with the fund.

The letters Apache cites to show that the S.E.C. staff retreated from its *Hain Celestial* position do not provide support for that proposition.  *See EQT Corp.*, 2010 WL 147295 (Jan. 11, 2010); *Microchip Tech., Inc.*, 2009 WL 1526972 (May 26, 2009); *Schering-Plough Corp.*, 2009 WL 890012 (Mar. 27, 2009); *Omnicom Group*, 2009 WL 772864 (Mar. 16, 2009).  In these cases, the shareholder seeking to have a proposal included in the company's proxy materials received a deficiency notice but either failed to submit documents intended to prove ownership or failed to do so within the 14-day period provided by the rules.  Other recent S.E.C. letters finding a basis for exclusion under Rule 14a-8(b)(2) when a broker letter was submitted are consistent in that there were defects in the broker letter that warranted exclusion.  *See, e.g., Continental Airlines, Inc.*, 2010 WL 387513 (Feb. 22, 2010) (shares listed in broker letter amounted to less than $2,000 in value); *Pfizer, Inc.*, 2010 WL 738739 (Feb. 22, 2010) (broker letter was never received by company and was dated three days before submission of the proposal, making it incapable of establishing ownership for a year as of the actual submission date); *Intel Corp.*, 2009 WL 5576306 (Feb. 3, 2010) (broker letter was dated 18 days after deficiency notice, received by the proponent 26 days late, and received by the company 31 days late).  These no-action letters all involved broker letters that were deficient for reasons other than the nature of the broker submitting them.  These no-action letters do not provide a basis for believing that the S.E.C. staff's reading of Rule 14a-8(b)(2) has changed since *Hain Celestial*.  *See Pioneer Natural Resources Co.*, 2010 WL 128070 (Feb. 12, 2010) (finding no basis for exclusion when the proponent, a union pension fund, had submitted a broker letter from AmalgaTrust, which was not a registered shareholder, stating that it served as "corporate co-trustee and custodian for the [pension fund] and is the record holder for 1,180 shares of [company] common stock held fore the benefit of the Fund.").

The S.E.C. staff's position in *Hain Celestial* and the similar letters is more consistent with the text of Rule 14a-8(b)(2) than the position Apache advances, that the Rule requires confirming letters from the DTC or Cede & Co. Apache argues that the DTC does offer letters certifying a shareholder's beneficial stock ownership and attaches examples to its reply brief. But these examples show that the DTC will only process letter requests forwarded to it by participants, not by beneficial owners. The record does not show how long it takes shareholders to obtain such letters, especially when they are not direct clients of a DTC participant. The documents Apache attached to its reply brief show that the DTC bases its response to such requests on information supplied by the participant. The responses state that the DTC is a "holder of record" of the company's common stock and that the "DTC is informed by its Participant" that a certain amount of shares "credited to the Participant's DTC account are beneficially owned by [John Doe], "a customer of Participant." (*See* Docket Entry No. 18, Exs. 21-24). The responses provide no indication that the DTC presents information about beneficial owners other than what is submitted by the participant for the purpose of preparing the letter. Nor is there information on how the participant obtains information about beneficial owners when the participant's customer is not the beneficial owner but the broker for the owners. And as a practical matter, because of the "netting" system, in which DTC members report only the net change in their ownership at the end of the day rather than the details of each transaction between members, the DTC could not accurately certify that a participating broker—let alone that broker's client—had held a sufficient number of shares continuously for a year to comply with the Rule. If a participating broker sold all its Apache shares one morning, its continuous ownership would end, but if it bought all the shares back after lunch, the DTC might never know. Finally, as noted, the text of Rule 14a-8(b)(2), which was amended in 1998 (well after ascendency of the

depository system), shows that the Rule does not envision companies receiving letters from the DTC (at least not *solely* from the DTC).  It is not a "broker or bank."  Rule 14a-8(b)(2) permits but does not require Chevedden to obtain a letter from the DTC.

This court need not decide whether the letter from Northern Trust, the DTC participant, in combination with the letter from RTS, met the Rule's requirements.  The January 22 letters from RTS and Northern Trust were untimely.  Any letters had to be submitted within 14 days of the December 3, 2009 deficiency notice.  The only letters submitted within that period were the November 23 and December 10, 2009 RTS letters.  The first letter stated that Chevedden had held no less than 50 shares of Apache stock in his account at RTS since November 7, 2008.  The second letter stated that RTS was the "introducing broker for the account of John Chevedden" and that Northern Trust was the custodian of his Apache stock.  (*Id.*, Ex. 6 at 2).  The second is the type of letter the S.E.C. staff found adequate in *Hain Celestial*.[16]  The present record does not permit the same result in this case.

---

[16]Apache argues that this case is distinguishable from the facts in *Hain Celestial* because RTS was not a broker.  Apache is correct that RTS does not appear on the SEC's list of registered broker-dealers, on the FINRA membership list, or on the SIPC membership list.  But neither does DJF Discount Brokers, which submitted the broker letter in *Hain Celestial*. RTS's website and customer application indicate that an RTS subsidiary, Atlantic Financial Services of Maine, Inc ("AFS")., acts as the broker for RTS customers' securities transactions.  AFS, which shares an address with RTS,  is on the SEC, FINRA, and SIPC membership lists.  Similarly, DJF's website states that it is a division of R&R Planning Group LTD.  R&R appears on the SEC, FINRA, and SIPC membership lists.

The Rule requires shareholders to "prove [their] eligibility."[17]  The parties agree that all Chevedden gave Apache as timely, relevant proof of ownership was the December 10 RTS letter. Apache has described its concerns about the reliability of the statements made in the RTS letter.  It is not Apache's burden to investigate to confirm the statements or to engage in such steps as obtaining a NOBO list to provide independent verification of Chevedden's status as an Apache shareholder.  Because of the limited nature of the NOBO list, Chevedden's absence from the list would not have been definitive.  And even if Chevedden were on the list and the list indicated that he owned a sufficient number of shares, that would not have established that he had owned those shares continuously for a year.

RTS is not a participant in the DTC.  It is not registered as a broker with the SEC, or the self-regulating industry organizations FINRA and SIPC.  Apache argues that RTS is not a broker but an investment adviser, citing its registration as such under Maine law, representations on RAM's website, and federal regulations barring an investment adviser from serving as a broker or custodian except in limited circumstances.  (Docket Entry No. 18 at 14-19).  Chevedden disputes that RTS has not provided investment advice and that its "sole function is as a custodian."  (Docket Entry No. 17 at 3).  The record suggests that Atlantic Financial Services of Maine, Inc., a subsidiary of RTS that is also not a DTC participant, may be the relevant broker rather than RTS.  Atlantic Financial

---

[17]Apache points out that it was not until the January 22 letters that Chevedden gave any indication that his shares were held in Cede & Co.'s name. This argument is disingenuous. Without even looking at the shareholder list, the default assumption for a publicly traded company should be that Cede & Co. holds a beneficial owner's shares. DTCC publishes a list of DTC member banks and brokers on its website.  The list is a seven-page document, with all the members listed in alphabetical order.  Once the December 10 letter identified Northern Trust as custodian, it would have been easy for Apache to look at the list and see that Northern Trust was included.  *See* Depository Trust & Clearing Corp., DTC Participant Accounts in Alphabetical Sequence, at 6, *available at* http://www.dtcc.com/downloads/membership/directories/dtc/alpha.pdf.  Apache also had the May 2009 "Cede breakdown" listing the DTC participants that owned Apache shares.  This list indicated that Northern Trust has a substantial position in Apache.  It also appears from the March 2010 Cede breakdown that Apache had access to the DTC website to obtain less formal versions of the Cede breakdown owning participants owning Apache shares at any time.

Services did not submit a letter confirming Chevedden's stock ownership.  RTS did not even mention Atlantic Financial Services in any of its letters to Apache.  The nature of RTS's corporate structure, including whether RTS is or is not an "investment adviser" is not determinative of eligibility.  But the inconsistency between the publicly available information about RTS and the statement in the letter that RTS is a "broker" underscores the inadequacy of the RTS letter, standing alone, to show Chevedden's eligibility under Rule 14a-8(b)(2).

Chevedden's interpretation of the Rule would require companies to accept *any* letter purporting to come from an introducing broker, that names a DTC participating member with a position in the company, regardless of whether the broker was registered or the letter raised questions.  Chevedden's interpretation of Rule 14a-8(b)(2) would not require the shareholder to show anything.  It would only require him to obtain a letter from a self-described "introducing broker," even if, as here, there are valid reasons to believe the letter is unreliable as evidence of the shareholder's eligibility.  By contrast, a separate certification from a DTC participant allows a public company at least to verify that the participant does in fact hold the company's stock by obtaining the Cede breakdown from the DTC, as Apache did in May 2009 and March 2010.

Chevedden did, ultimately, submit a letter from the participant, Northern Trust, along with a letter from RTS.  The January 22 Northern Trust letter refers to RTS's account and RTS's stock ownership; the RTS letter submitted that same day linked RTS's account with Northern Trust to Chevedden.  Because these letters were submitted well after the deadline, this court does not decide whether they would have been sufficient.  The only issue before this court is whether the earlier letters from RTS – an unregistered entity that is not a  DTC participant – were sufficient to prove eligibility under Rule 14a-8(b)(2), particularly when the company has identified grounds for

believing that the proof of eligibility is unreliable.  This court concludes that the December 2009 RTS letters are not sufficient.

Although section 14 of the Securities Exchange Act of 1934 (governing proxies), under which Rule 14a-8 was promulgated, was intended to "give true vitality to the concept of corporate democracy," *Medical Comm. for Human Rights v. SEC*, 432 F.2d 659, 676 (D.C. Cir. 1970), *cert. granted sub nom SEC v. Medical Comm. for Human Rights*, 401 U.S.973, 91 S. Ct. 1191 (1971), *vacated as moot*, 404 U.S. 403, 92 S. Ct. 577 (1972), that does not necessitate a complete surrender of a corporation's rights during proxy season.  Rule 14a-8 requires a shareholder seeking to participate to register as a shareholder or prove that he owns a sufficient amount of stock for a sufficient period to be eligible.  Although this court concludes that Rule 14a-8(b)(2) is not as restrictive as Apache contends, on the present record, Chevedden has failed to meet the Rule's requirements.

## III.    Conclusion

Apache's motion for declaratory judgment is granted and Chevedden's motion is denied. Apache may exclude Chevedden's proposal from its proxy materials.

SIGNED on March 10, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge